The People of the State of New York, Respondent, *v.* Richard Barber, Appellant.

Where upon the trial of an indictment for murder the defense is that defendant was an epileptic and that the homicide was the unconscious and uncontrollable result of epileptic mania, as bearing upon the issue so presented, the absence of motive is important.

While medical expert witnesses may be permitted to state, in connection with their opinion, as to the sanity or insanity of a person, based upon the testimony in the case, the reason upon which it was founded, inferences from the facts which are within the range of ordinary judgment and experience are to be drawn and found by the jury, and cannot be proved as facts by the opinion of such witnesses.

Where, therefore, in a criminal action in which the defense was insanity, medical experts, aside from their opinion as to the main issue, were permitted to give their opinion as to the effect of certain facts proved upon

the question of guilt or innocence and of the mental operations of the defendant, to wit, that certain facts indicated consciousness, apprehension, untruthfulness, etc. *Held,* error.

(Argued June 24, 1889; decided October 8, 1889.)

APPEAL from judgment of the Court of Oyer and Terminer of the county of Tompkins, entered on the 30th day of October, 1888, upon a verdict convicting defendant of the crime of murder in the first degree under an indictment charging him with the murder of one Ann Mason on the 16th day of October, 1888.

The defense was insanity, the claim being that the defendant was an epileptic, and that the alleged crime was committed while the defendant was in a condition of epileptic furor.

The defendant, Richard Barber, was twenty-seven years of age, born in Billingsborough, England, came to this country at the age of nineteen, and became a resident of the town of Ulysses, where a married aunt, the sister of his mother, had resided for many years. His employment was that of a farm laborer.

The only witness of the homicide was Richard Mason, the husband of Ann Mason. The Masons were old people, over seventy years of age, without children, who occupied a small farm about one and a half miles from the village of Trumansburgh, living alone in the house upon the farm, the scene of the tragedy.

It appears that at about seven o'clock on Friday evening, the night of the homicide, Barber left the house of Thomas Donahue, for whom he had worked several seasons, and which he made his home when out of work, and walked along the road towards Trumansburgh. Donahue lived about a mile and a half east of Trumansburgh and about three miles from the Masons, the villages lying between their residences. On his way to Trumansburgh Barber met one Robertson, for whose sister Barber had engaged to work the ensuing season. Some conversation on this subject was had between them and it was agreed that they should go together to the house of

Robertson's sister, a distance of about nineteen miles, on the following Sunday, when Barber should commence work. There is no evidence that Barber was seen by any other person before reaching Mason's house. The evidence of Richard Mason was taken by deposition before the trial and read to the jury. It was as follows:

" Q. Your name is Richard Mason and your residence is in Ulysses, Tompkins county, N. Y.? A. Yes, sir. Q. How old are you? A. Seventy-four. Q. What was your wife's name? A. Ann Mason. Q. In March, 1888, was you and your wife all your family? A. Yes, sir. Q. Do you know the defendant Richard Barber? A. Yes, sir; I know him to my sorrow. Q. Do you remember the night of the 16th of March, 1888? A. I do and always shall. Q. Did you see Barber on that night? A. Yes, sir. Q. Where did you see him? A. I first saw him at the well curb at the back of the house, near the back door of the house, about nine o'clock in the evening. Q. What occurred after that? A. I walked in with a lantern and asked him to come in and Barber came in with me. Q. After he came in what then occurred? A. He sat down in a chair and I asked him where he had been so late and he said up the road a bit; I asked him if he was going to Thomas Donahue's and he said he guessed so; I told him he had better stay all night the roads were so rough, and he could stay as well as not; he said he guessed not; I asked him if he would have any supper and he said no, he guessed not; I knew he was fond of apples and I asked him if he would have some apples, and he said he guessed he would; I fetched a tin of apples out of the pantry and he ate one, and I said they were rather poor and if you will wait I will get you some better; I went down stairs and got five or six apples and put them in the tin in the room where he was; I set them down and he took an apple and I took and pared an apple and ate it; I went across the room where I was to sit down, and when I passed by him he struck me on the back of the head three or four times and knocked me down and cut my head with something, I did not see what it was; he knocked me sense

less on the floor; it seems to me I got up and turned around to him and said, did you strike me, and he said no, I did not, just as calm as could be, and I did not know where the blow came from; I did not see anybody else; there was not anybody else there; then he struck me three or four times, and I fell in the opposite direction; then he went into the room where my wife was, and struck her with something across the head and she screamed; he beat her two or three times after she did scream, as she lay on the bed, and then I recovered a little from my blows; I turned in the direction in which she was, and he struck me again and knocked me down on the other side of the house; then I crept under a bureau in the corner of the room; there I lay bleeding and my wife screaming, and I wanted him to go away and take the light, and I will follow you to see my wife, and he said you come and take the light and go and see her; I said if I do come out from under this table you will hit me; he says I won't, and I started to come out and he struck me and I went back again under the table; then I wanted him to take the lamp and go so I could look at my wife and get a pistol from the drawer of the bureau; he watched me so close and kept so close to me that I could not get it; then I went back under the bureau; I begged and prayed him not to strike me again; then he did not strike me; I kept under there half an hour or three-quarters, I could not tell; he stood there all the while and said nothing, and then I asked him why he came there to knock me and my wife in the head for; I told him I haven't got nothing worth knocking us in the head for, for what little he could get; he stood there a little while and I asked him why didn't you leave the house and go away; then he didn't go, and then he picked the cushion out of the chair, and he put the cushion and hearth rug on my leg and put kerosene on them and set them on fire; then I kicked the rug and cushion off my•leg, and then he picked up the cushion and rug and accordion and put them on the table in the corner of the room, and he took the little lamp and poured oil on them and set fire to them; then he had the door knob in his hand

and he kept looking out north and south to see if he saw any-body coming; then he kept watching the fire, when it got up to a pretty good headway, and in a few minutes I said, why don't you go away? I can't get out of here; I shall lie here and perish and burn up with my wife; that is the last time I have seen or heard him at that house; my wife lay in the room during all this time dead in the bed I expect; there was blood all over on the floor; piles of it; after he left I got out of the house; the lamps and glass fell down and a great smoke rose up, and flames, and I crept out of doors under the flame and smoke; I crept through the little hall and through the wood-shed and out to the wood-pile in the orchard; Mr. Milt Cuffman and Fred Woodin came there; I had some money in the house; between one hundred dollars and two hundred dollars, more or less; fifty dollars paper-piece of money, and twenty dollar gold-piece of money and the rest in bills, and some silver; I got thirty-six dollars and some cents for apples from Ed Murphy something less than a week before this occurred; I sold two fat pigs and a calf to Charles Thompson, the butcher, for thirty dollars; got my pay a little time before this sixteenth of March; a week or so; I sold two cows some two or three weeks before that to Charles Thompson for twenty-four dollars; Barber had been to visit me about three weeks before this; he stayed there one after-noon; he has visited me there three or four times during the year before; I had the fifty-dollar bill and the twenty-dollar gold piece before the sale of the apples, pigs, calf and cows."

Cross-examination: "I don't remember when I got the fifty-dollar bill and gold piece for twenty dollars; some time ago; perhaps ten years ago; my wife was my banker; I did not know what money was in the house on this sixteenth of March more than you do; I took some silver from the house a few days before that; did not take all the silver; don't remember how much I did take away; I took a dip at it and run; my wife did not hand me the money that I took away; I asked her for some money to buy feed at Waterburg; there was some one hundred and thirty dollars in the house on this sixteenth of March; remem-

ber of seeing this money within the house within the last year several times; I saw it in the big room; she used to fetch it out of the buttery in a tin painted blue; think I am sure she kept that money in the buttery; I did not know where this money was; whether the defendant knew about this money I can't say; nothing had ever occurred between us; we were just as good friends as kittens; when I went out that evening with a lantern to the barn to see the cows I took a lighted lantern with me when I left the house; I was gone to the barn about three-quarters of an hour; it might have been less than three-quarters of an hour; it might have been less than one-half of an hour, but I think not; when I came back from the barn I saw Barber at the well curb; the well curb was about two or three yards north-west of the kitchen door; think Barber and I sat there visiting about an hour before the assault commenced; we were talking and visiting pleasantly, entirely so; my wife went to bed before I went to the barn and about three-quarters of an hour before Barber came; she had been to bed a little while before I went to the barn; after I was struck by Barber, I did not call to my wife; after I got up from the blow I guess I did call to her, but got no answer back; that was before Richard Barber went into my wife's room; he then went directly into my wife's room and commenced pounding her; she halloaed murder, and screamed quite loud; she screamed four or five times; I heard him continue pounding her and heard her groan; the groanings and screamings ceased after a while, long enough for her to die; I had conversation with him about coming out from under the table lasting three-quarters of an hour or an hour after he left my wife's room; I never saw what Barber had in his hand; could not see; there was some kindling wood on the floor where Barber and I sat; it was, some of it, apple and some of it cherry, dry and hard; those pieces were about sixteen inches long; some of them two inches square, and some smaller, an inch or so; he struck me two or three times before I fell to the floor on the back of my head, as I was passing by; don't remember as he struck me after I fell to the floor;

Statement of case.

Barber and I were on the best of terms prior to this; before this during the winter he had made me a present of two old vests that I could wear in the summer; I believe he told me that evening that he was expecting to go to work in Lansing the following Sunday; I believe he said something about it; he used to come to the house and see my wife and play on the accordion; she liked music and liked to hear him play; the accordion was getting quite old; I heard him say that he had a music box somewhere, and I can't say where now; I can't remember that I heard him say that Ann could turn the handle of the music box, but I heard him say something about a music box somewhere, but I can't remember when; he did say at some time that Ann could operate the music box by turning a crank; I can't tell whether he said that to me or not; he would not have been likely to say anything to me about Lansing prior to that night; I can't tell where I got that fifty dollar bill; don't know how it got there; seems to me my wife got it drying apples a year ago last fall; when I went down cellar for apples I did not take a dish, but brought them up in my hand; I was sworn a day or two after the fire; I said then I had no suspicion there was anything wrong between him and me; I said then that I never had any conversation with Barber about money; that is true; I saw Barber when he poured oil out of the lamp; I saw him take a match out of his pocket; I saw him light the things, but can't say where the match came from; I can't say whether the flames were kindled by a match, or by a paper lighted from the lamp on the table; the door that he opened, and looked out of, was the front door of that little wing; he went out of that door; I went out of the back door; I had between twenty dollars and twenty-four dollars, or about that, in my pocket as I lay on the floor that night."

Redirect: "I and my wife were the only ones there that night except Barber; I did not keep candles or have candles about the house at the time of this assault; I had not kept candles there for a great many years; the table or bureau I

crept under was a high-legged bureau or table with drawers in the upper part, and open underneath."

Richard Mason was found near an out-house and was taken to a neighboring house. The house burned to the ground and the charred remains of Ann Mason were found in the cellar under the place where she was sleeping at the time of the assault. Whether she was killed by the blows or burned to death was left in doubt. Barber was first seen after the fire in the highway about a mile from the Mason house, towards Trumansburgh, by a witness who knew of the tragedy and that Barber was suspected, and had started in a cutter from Trumansburgh to go to the Mason house. He knew Barber and asked him to ride back to the village with him, to which Barber assented, and on the way he proposed to Barber to go to a dance there, to which he also assented. The witness drove to the door of the barn of the hotel and asked Barber to open the door, which he did, and while the witness was tying his horse Barber walked away "fast," and was followed up and arrested a few rods from the barn. He was searched and there were found upon him a pocket knife, small change, less than a dollar in amount, a piece of candle wrapt in a paper, a pair of mittens and a pocket-book. After his arrest, and on the same night, he was taken to the house where Mason was and was identified by him, and on being asked by Mason why he killed his wife and pounded him, at first made no reply, but finally said: " I do not remember doing it."

The defense sought to establish that the defendant had an inherited tendency to epilepsy, and, also, that up to the age of nine years he had been the subject of frequent epileptic seizures. The most important evidence on their part was that of a Dr. Thomas Blasson, of Billingsborough, England, a medical practitioner of thirty-two years' standing. Dr. Blasson, whose evidence was taken on commission, testified that he was fifty-three years of age, and attended at the birth of Richard Barber, and on more than forty occasions during his childhood, was called to treat him professionally for

severe epileptic fits, and that these attacks were attended with delirium and violence; that he was the family physician of many of the relatives of the defendant. He testified: "Richard Barber himself was affected with epilepsy, also his grandfather, Thomas Johnson; his aunt, Ann Johnson, was rendered insane by epileptic seizures, and is now a lunatic and confined in an asylum; his aunt Elizabeth Louth, his cousin John Louth, who developed epilepsy about the age of twenty, his cousin Thomas Louth's two children, several of his brothers and sisters, two of whom died from epilepsy; his great uncle, William Johnson, had violent epilepsy and was drowned in a ditch during an attack of epilepsy; his cousin Fanny Holland, his grandfather's cousin, Thomas Johnson, of Millthorp, who committed suicide by hanging, have all been subject to epileptic fits and have been attended by me professionally for such disease. All of the family named in the previous answer were at times highly nervous and excitable. Richard Barber's grandfather, Thomas Johnson, and aunt, Ann M. Johnson, were especially excitable and passionate, and extremely impatient of control or contradiction." Sarah Barber, the mother of the defendant, a resident of Billingsborough, testified that she had had nine children, all of whom had been subject to fits; that two died in fits in infancy; that her son Thomas (a soldier), aged twenty-two years, had had fits occasionally up to the time of his leaving England, three years ago; that her daughters Mary Ann and Martha suffered severely from fits until they were about eight years of age, and also her son John Samuel; that her son William, twelve years of age, had been subject to fits all his life; that Richard (defendant) had fits almost weekly, sometimes several times a week until he was nine years of age; that he was always very violent during these attacks, and had to be restrained by force to prevent him from doing injury to others; that there was no warning of these attacks, and that the children were left weak and nervous after the fits, and this condition would last about two hours, when they would appear

about the same as before.    Mrs. Barber corroborated Dr. Blasson as to other relatives having been affected with the same disease.

The defense called a large number of experts, who, in answer to a hypothetical question founded upon the proof of hereditary predisposition of the defendant to epilepsy, his medical history during his childhood, and his physical condition during the winter prior to the homicide, as testified to by Mr. Donahue and others, and all the circumstances of the transaction, stated, without hesitation, that, in their judgment, the defendant, at the time of the alleged homicide, was in a state of epileptic furor, one of the manifestations of the disease, which rendered him uncontrollable and unconscious of the character of his acts.    The medical witnesses for the defendant embraced some of the most distinguished alienists in the country, and also men of large experience as general practitioners.

The prosecution also called numerous physicians who expressed the opinion that, upon the facts appearing in the case, the defendant was not insane, and was not under the influence of epileptic furor at the time of the alleged homicide. Their opinion was largely influenced by the considerations (1), the absence of any evidence of epilepsy in the defendant since childhood; (2), his cautiousness and the apparent possession by the defendant of his observing and reasoning faculties at the time of the homicide; (3), his supposed attempt to hide his crime and elude observation after the homicide.

Other facts are referred to in the opinion.

*George B. Davis* for appellant.    The verdict or verdicts were against the weight of evidence.    (17 N. Y. S. R. 100; Ray's Med. Jur. of Ins. § 460 ; Whart & Stille's Med. Jur. § 470 ; *People* v. *Montgomery*, 13 Abb. Pr. [U. S.] 207.)    There was shown no motive, excuse or cause for the crime.    (*People* v. *Bennett*, 49 N. Y. 137.)    The test or distinction laid down in section 21, Penal Code, does not apply to victims of insanity of the character described by the evidence in this case.

(3 Abb. N. C. 200; *People* v. *Cole,* 7 Abb. Pr. 321; 8 id. 103.) The court erred in not receiving the first verdict of the jury and in instructing them that, under the indictment in this case, they had no right to find arson, etc. (Code Crim. Pro. § 451; 3 Abb. N. C. 207; *People* v. *McDonald,* 49 Hun, 67; *People* v. *Tameney,* 30 Hun, 505; *People* v. *Dowling,* 84 N. Y. 478; *People* v. *Guenther,* 24 id. 100; *People* v. *Hale,* 1 N. Y. Crim. Rep. 533; *People* v. *Seeley,* 3 id. 225; U. S. Constitution, art. 5; Constitution of N. Y. S. art. 1, § 6; *People* v. *Cignarale,* 110 N. Y. 30, 31; 1 N. Y. Crim. Rep. 533.)

*J. H. Jennings* for respondent. It was competent for the prosecution to show that Mason had a considerable sum of money in the house on the night of the homicide, and that he had disposed of produce for cash a short time prior thereto, as bearing upon the question of motive, and this without bringing it home to the knowledge of defendant. (*Kennedy* v. *People,* 39 N. Y. 245; *Hendricks* v. *People,* 10 id. 13.) When insanity is alleged as a defense to a criminal action, a witness not an expert may characterize as rational or irrational acts and conversation of defendants. (*People* v. *Conroy,* 97 N. Y. 62; *Holcomb* v. *Holcomb,* 95 id. 316.) There was no error in the judge's charge. (*People* v. *McCallen,* 103 N. Y. 587; *People* v. *Minisci,* 12 N. Y. S. R. 719; *People* v. *Conroy,* 97 N. Y. 62; N. Y. Penal Code, §§ 21, 23; *Walker* v. *People,* 88 N. Y. 81; *People* v. *Coleman,* 1 N. Y. Cr. R. 1.) The jury by rendering a verdict of " guilty of arson in the first degree " did not render a general or special verdict or as defined by the Code of Criminal Procedure (§§ 437, 438), and the court could direct them to reconsider their verdict. (Code Crim. Pro. §§ 447, 448.) An expert may give the reasons for his opinion. (*Lewiston, etc., Co.* v. *A. W. P. Co.,* 78 Me. 274; *Barber* v. *Merrian,* 11 Allen, 322; *Stearns* v. *Field,* 90 N. Y. 640; *Harnett* v. *Garvey,* 56 id. 641; *Ferguson* v. *Hubbell,* 97 id. 507–513; *Coyle* v. *Comm.,* 104 Penn. St. 117.)

Andrews, J. The evidence establishes beyond question that the death of Ann Mason was caused either by the blows inflicted

by Richard Barber or by the fire which he set, from which, by reason of her injuries, she was unable to escape. It is not denied that Barber was the actor in the tragedy which resulted in the death of one human being, and ultimately in the insanity of another. These two old people having outlived the ordinary limit of life, at last were, by the act of one whom they had treated with the greatest kindness, subjected to these irreparable injuries. If the act of Barber was that of a sane man, legally responsible for his conduct, the verdict of the jury and the judgment of death were never, in any case, more fitly rendered. The question of Barber's sanity was the sole question litigated on the trial. To this question the voluminous evidence mainly pointed, and we are called upon to determine, not the final question of Barber's sanity or insanity, because that is, and must be, in the end, a question of fact which a jury must determine, but simply whether, upon the whole case, as it now appears to us, justice requires that a new trial should be had, and a new jury summoned to re-examine the question of Barber's criminal responsibility. It is unnecessary to say that we have examined the evidence and proceedings on the trial with great care. The case, in many of its aspects, is extraordinary, and, in reaching the conclusion that justice requires a new trial, we should be misunderstood if it should be inferred that there was anything in the conduct of the trial indicating that it was conducted in any spirit of unfairness towards the defendant.

It is a striking feature of the case, which arrests the attention at the outset, that no motive for the murder, for which the defendant has been convicted, was shown, and, indeed, that no reasonable suggestion of such motive is discoverable from the evidence. It was shown that the Masons had between one and two hundred dollars in money in the house, in the custody of Mrs. Mason, and kept by her in the buttery. The money was in bills, excepting a twenty-dollar gold piece and a little silver. There is no evidence that Barber knew there was any money in the house. The inference from the testimony of Richard Mason is that he did not know it.

When Barber was searched, an hour or two after he left the house, no money was found upon him, except a few shillings in change. The bills which were in the Mason house may have been burned in the fire, and the gold piece (if, in fact, there was a gold piece) may have been lost among the *debris,* or may have been taken by some of the many persons who visited the scene of the tragedy. There is not the slightest evidence that Barber had, at any time, any of the money in his possession. The recital by Richard Mason of the transaction at the house tends strongly to refute any suggestion that Barber searched for or took any money from the house. The twenty dollars which Mason testifies he had in his pocket were not touched. The evidence of Richard Mason is conclusive that there was no quarrel between himself and Barber, and that nothing occurred between them to excite sudden anger on the part of Barber, or provoke an assault. There was not only an absence of any evidence of motive on the part of Barber to injure the Masons, but they were among his best friends. The defendant became acquainted with them soon after he came to this country, he then being a lad nineteen years of age. The Masons were persons in humble circumstances, advanced in years and childless. Mason was also an Englishman. Barber visited them quite frequently, and the relations between them and Barber became of the most friendly character. Little attentions and kindnesses were exchanged and Barber regarded them as his " best friends in America." The character of Barber prior to this transaction justified the confidence and affection which these two old people exhibited towards him. The evidence is undisputed that he was industrious, temperate, frugal, with no bad habits, of amiable disposition and of quiet and reserved manner. This was his character in England before he came to this country, and was his character here. There is no evidence or suggestion even that prior to the transaction in question he had injured any one or had exhibited any evil tendencies.

The evidence of what occurred at the house of Mason on the night of the murder is confined to the testimony of

Richard Mason. His story is given in full in the statement
of the case. In one view it describes an intentional, unpro-
voked and murderous assault by Barber upon Richard Mason
and Ann Mason, followed by an attempt to burn the house to
conceal the evidence of his crime. In this view the story has
extraordinary features. There was apparently no preparation
to commit the crime. Barber had no weapon or deadly instru-
ment with which to accomplish his purpose when he went to
the house, if he then had murder in his heart. The evidence
tends to show that he picked up the first implement at his
hand with which to make the assault. One of the strange
features of the history is the conduct of Barber in leaving the
house on the entreaty of Mason, while Mason was still alive
and under the bureau, without finishing his deadly work,
seemingly accepting the assurance of Mason that he could not
get out, but would be compelled to lie there and burn up with
his wife.

As we have said, the sole defense was insanity. The defendant's
counsel sought to establish by evidence that the defendant at the
time was under the influence of epileptic furor, caused by
epilepsy, and that his acts were the unconscious and uncon-
trollable result of epileptic mania. To sustain the defense of
insanity the defendant's counsel in the first instance sought
to prove an inherited predisposition to epilepsy in the
defendant. Their most important evidence on the point was
the testimony of Dr. Blasson, an English surgeon and physician
of thirty-three years practice, a resident of Billingsborough,
England, who had known Barber from his birth, and who had
been the family physician of the Barber family for many
years and had professionally attended many of the maternal
relatives of Barber during attacks of epilepsy. Dr. Blasson's
testimony was corroborated by evidence of Barber's mother
and other members of the family, and was contradicted by no
one. The evidence of Dr. Blasson is fully recited in the state-
ment which precedes the opinion. His evidence, if credited,
shows that for generations epilepsy had been a marked
characteristic among the maternal relatives of the defendant.

His grandfather, his grandfather's cousin, his great uncle, two aunts, several cousins and all his brothers and sisters were, as Dr. Blasson testifies, epileptic, and were attended by him for that disease.   One of the aunts became insane in consequence of the disease and is now confined in an asylum; a great uncle was drowned in an epileptic seizure; another relative committed suicide by hanging, and several of Barber's brothers and sisters have died from the disease.   In short, the medical history of the family, as related by Dr. Blasson, exhibits a record of cerebral disease resulting from epilepsy of the most marked and striking character.   All the experts on both sides, who testified on the subject, unite in saying that hereditary predisposition is the great cause of epilepsy.   Barber up to the age of nine years had frequent fits, accompanied by violence and delirium.   Dr. Blasson, who attended him on forty or more of these occasions, declared that they were the fits of epilepsy.   The remission of these attacks after that age for eighteen years, without any known recurrence up to the time of the homicide, was regarded by some of the experts examined by the prosecution as indicating that the fits which Barber had in his childhood were not of an epileptic character. It was claimed, on the part of the defendant, that during the winter of 1887–88 there were indications that the defendant suffered from nocturnal epilepsy.   The Donohues, with whom he had lived that winter, testified to various circumstances — the condition of his bed, incontinence of urine, and other facts which experts testified were indications of the disease. He had a skin disease during the winter of an irritating character.   He was said to be nervous and haggard.   He complained of his head and in the morning looked tired, and when playing checkers, as he sometimes did, he could not hold his attention.

We have stated sufficient of the circumstances developed on the trial to show that the case is a remarkable one in many aspects, and that whatever the truth may be, the defense of insanity was one most proper to be urged, and required most

deliberate and careful consideration. It was assumed by all the medical witnesses that if Barber, when he assaulted the Masons, was in a condition of epileptic mania, he was unconscious of the nature or character of his acts. The question of motive was manifestly a most important consideration on the issue of insanity. It is only at times that epileptics are unconscious or irresponsible, that is when the disease breaks out into what is known as epileptic furor, which may come without special warning, and after a brief period pass away. The court was asked to charge the jury that if no motive had been established for the crime, it should be regarded as important on the question of epilepsy. This request was refused, except as charged. The judge, in his charge, had said to the jury : " If there were, in fact, no motive for the atrocious murder, it does not need an expert to tell us that that is an important question in determining what was the condition of his mind. Whether there was a motive or not, I will refer to hereafter." Referring to the subject afterwards the court stated to the jury that it "was not necessary for the People to show you that there was an adequate motive for this act." And, again, " It is not necessary for the People to show what his motive was, but they claim that the reason and the method, and plan and design apparent in the act which he did, in itself indicate sanity, and indicate that there was method, and that there was motive for the act itself." We think it would have been better if the learned judge had brought to the attention of the jury, with more distinctness, the consideration which should be given to the absence of motive as bearing upon the question of epilepsy.

On both sides experts were examined, who expressed their opinion on a hypothetical question embodying the facts claimed to have been proved, as to the sanity or insanity of the defendant at the time of the homicide. One of the questions was framed by the prosecution and one by the defendant. The prosecution thereafter framed a series of specific questions, which they propounded to the experts introduced by them, and which they were permitted to answer. We think

some of these questions went beyond the permissible scope of examination of experts. The opinion of medical experts as to the sanity or insanity of the defendant, based upon testimony in the case, assumed for the purpose of the examination to be true, was undoubtedly competent. So, in connection with their opinion, they could be permitted to state the reasons upon which it was founded. (*Lewiston S. M. Co.* v. *Androscoggin Water Power Co.*, 78 Me. 274.) But inferences from facts proved are to be drawn and found by the jury, and cannot be proved as facts by the opinion of witnesses. The evidence given under the special questions encroached, we think, upon the domain of the jur  and exceeded the reasonable boundaries of expert    idence. The following questions and answers are illustrations : " Q. What do you say as to his holding the door-knob and looking up and down the road ? A. That is evidence of consciousness. Q. Does it indicate apprehension ? A. Yes, sir ; it does. Q. What does it indicate ; the absence of blood on his person ? A. That he knew enough not to leave marks on his person that should identify the crime. Q. What do you say of his stating to an acquaintance whom he met, who informed him that the fire was at Waterburgh, that he thought so, too ; what would that indicate to you ? A. It would indicate that he lied if he was moving away from it. Q. His hastening away from the barn, what do you say to that ? A. It would indicate that he knew he had done something he ought not to have done, and something to run away from. Q. And his not asking why he was arrested, what do you say to that ? A. That he already had a knowledge of the act which he concealed. Q. If he remained watching the fire, and when it got a pretty good headway, Mason said to him, " Why don't you go away ; I can't get out of here ; I shall lie here and perish and burn up with my wife," after Mason assured him he could not get up, and he should then leave, would that show knowledge of what he was about and a design, a belief and intent on his part that Mason should lie there and burn up with his wife, what would that indicate ? A. It would indi-

cate that he knew what he was about. Q. That he understood and believed what Mason told him? A. Certainly. Q. And that he acted upon that belief of what Mason told him? A. Certainly. Q. What did his breaking his agreement to go to the opera-house and hastening away from the barn show? A. It showed an attempt to escape. Q. And did it show also a knowledge or consciousness of a wrongful act committed? A. Certainly. Q. Would a person who was committing an act of violence during an epileptic seizure, could he return to consciousness before completing the crime and see before him the crime he had committed, would he be liable to have remorse and flee from the deed or crime, or would he help and assist, etc? A. As soon as he came to himself, if these were his friends, he would, of course, show remorse; if he attempted to kill them he would run away."

It cannot be doubted that many, if not all, of these questions and answers were improper. The inferences to be drawn from the facts referred to in the questions were matters for the jury. They were within the range of ordinary judgment and experience and were not the subject of expert testimony. The evidence was not given as reasons for the opinion of experts on the main issue of sanity or insanity, but was independent proof by opinion of the effect of certain facts in evidence upon the question of guilt or innocence, and of the mental operations of the defendant. At least so it might well have been regarded by the jury, and it is needless to say that in this view it was damaging to the defendant.

On consideration of the whole case, we think a new trial would subserve the ends of justice. We express no opinion as to how the case should be finally decided. This is not our province. The facts relied upon by the prosecution to show the adaptation of means to ends, the alleged flight across the fields, the conduct of the defendant after his arrest, his calmness of demeanor, both at the house and afterwards, are factors of importance upon the question of the defendant's legal responsibility. It will be the duty of the jury, on a new trial,

to consider them in connection with the whole evidence, and theirs will be the final responsibility.

The judgment should be reversed and a new trial granted. All concur, except FINCH, J., not voting.

Judgment reversed.