Froessel, J.
Defendant, a 22-year-old epileptic, was convicted of murder in the first degree and sentenced to death. He was charged with causing the death, on the night of April 17, 1957, of Patricia Buland, a girl of 19, by striking her face and head with a hammer at least 19 times while they were seated together in the rear seat of his automobile in the County of Kings.
On his arraignment, he entered a plea of not guilty with a specification of insanity. He sought to establish at the trial that at the time of the homicidal assault on decedent he was in the throes of an epileptic rage or furor attack, and consequently was laboring from such a defect of reason as not to know the nature and quality of the act or that it was wrong.
Defendant was employed as an oil burner installation and service mechanic. His education consisted of attendance at elementary school, from which he was graduated at the age of 15%, after having been “left back ” several times, and one year of vocational high school. He had an I.Q. of 80, and was described by one of the defense psychiatrists as “ a high grade moron intellectually ”.
The facts pertaining to the homicide are in large measure undisputed, and there was no real issue at the trial as to whether defendant had, in fact, committed the homicide. Defendant spent most of the evening in question drinking with friends. He had 15 to 20 beers, either alone or, as he claimed, “ chased ” by ryes, had eaten nothing since he had a sandwich at 11:00 a.m., and was feeling “high”, but not drunk. After leaving his friends and returning to his car, he noticed decedent crossing the street and offered her a “ lift ” at about 10:25 p.m. He had known her for about two months but had never “ dated” her, and was in fact engaged to be married to another girl.
After decedent entered his car — a green Ford belonging to defendant’s employer, which defendant was permitted to use — they drove to the street on which decedent lived, where they parked, talked and started kissing. About five minutes later they drove further down the same street, parked again, resumed *611 kissing and ‘1 necking ’ ’, and then went into the back seat, where they continued their lovemaking, and decedent’s undergarments were removed.
Defendant gathered that decedent was willing to engage in an act of sexual intercourse with him, whereupon she said “ No, not yet ’ ’, that she would like to go for some drinks. By his own statement, defendant at about this time picked up a ball-peen hammer which, along with other tools and a small tool box he used in his work, was always kept on the car floor in front of the back seat; he started swinging and struck decedent on the face and head at least 19 times. Defendant thereafter returned to the front seat, drove the car to 94th Street and Marine Avenue, placed decedent on the curb, and then drove home and went to sleep. The next day he placed the hammer in the trunk of the car, deposited in a garbage can decedent’s shoes and pocketbook, which, together with the hammer, he had found in the back seat, and purchased a new set of slip covers, which he placed on the back seat the following morning to cover the bloodstains.
Decedent was discovered lying partly on the sidewalk and partly on the street by a passerby at about 11:30 p.m. The latter testified that she saw what appeared to be a green Studebaker maldng a right turn at the corner. Decedent was wearing a fur coat and a dress and was naked from the waist down. She was lying on her back moaning, moving her arms and legs, but not responding to questions, and was bleeding profusely from the head. She was removed to Coney Island Hospital at about 12:30 a.m., where efforts to save her life proved fruitless, and she died about three hours later. An autopsy was performed on the body and the cause of death was attributed to “ multiple lacerations of the scalp and face and multiple fractures of the skull, with cerebral lacerations and contusions, with hemorrhage ’ ’. The medical examiner who performed the autopsy enumerated 19 contusions, lacerations and abrasions, concluding that at least 19 blows were struck and possibly more, since “ one blow could be superimposed upon the other, and make it difficult to distinguish”. There was no evidence of abrasions, contusions or semen around decedent’s genitalia.
On Saturday, April 20th, three days after the homicide, two police officers interviewed defendant at his place of business. *612 Defendant gave a strained account of Ms whereabouts on the night of the slaying, and after the officers discovered bloodstains in the car they took defendant to police headquarters, where, in one oral statement and two question and answer statements, he admitted striking the girl with the hammer and disposing of her body. He was arraigned the following morMng in Felony Court.
Defendant took the stand in his' own behalf and testified that when decedent said “No, not yet”, he suddenly felt dizzy, experienced a pounding sensation in Ms head and started shaking. The next tMng he remembered was hearing a screeching of brakes and someone yelling at him, and he became aware of the fact that he was driving on the wrong side of the street and had had a near collision with a car approacMng from the opposite direction. A few minutes later, when he turned around to see if a car was behind him, he saw decedent in the back seat. He “ didn’t know what to do ” and “ figured I better take her home or take her some place ”. He remembered taking her out of the car and putting her on the curb, but did not remember whether she was breathing, moaning or bleeding at the time.
Defendant further testified that when he found the girl’s pocketbook in the car, he remembered that she had been with him the previous evening. He saw the spots on the seats and thought that he must have done something, so he disposed of the pocketbook in a garbage can and bought new seat covers to cover the stains. After hearing the details of the crime on the radio and reading them in the newspapers, he assumed that he had done it and hence initially lied to the police about his whereabouts, etc.
The defense sought to establish that defendant was a chronic epileptic, had suffered several violent “ fits ” in recent years, and had delivered the fatal blows while in the throes of another such violent seizure. Several witnesses testified to nine “ fits ” which they saw defendant suffer: one in 1952, six in 1953 and two in 1955, while in the Army. All but two or three were preceded by beer or liquor drinking and generally nothing to eat. The two seizures described in greatest detail were suffered in front of a moving picture theatre and at a church dance. One witness described the former as follows: “ Well, we were sitting there on the steps, talking, me and Tommy, and Tommy started *613 shaking. Then he stood up and he started hanging wall with his fists. Then he started cracking his head against the wall. And then he fell and was like unconscious, and the police came.” (Emphasis supplied.) 'When the police arrived he became violent again, picked up one or two of the officers, threw them off and started swinging.
At the church dance, while conversing with a priest, defendant started shaking, fell to the ground, and struck the priest on the shoulder when the latter tried to help him. He was hitting his head and fists against the ground, swinging like a fighter at the people dancing and at anybody in front of him, and kicking and trying to fight off several people who were attempting to hold him down. A policeman handcuffed him to a bannister, but defendant continued swinging and smashed his other hand through a wire-glass window.
The other seven observed seizures occurred at a basketball game, in front of a luncheonette, at a party, twice in his fiancee’s home, in his army barracks, and outside a bar in Japan. Defendant’s behavior pattern was very similar: he would start shaking and swinging out violently before or after falling to the ground, foam at the mouth, and swing his arms wildly in all directions, striking out at anyone who came near him. On one occasion he struck a friend on the chin, and on another grabbed someone by the shirt and started tightening up on the collar. It would often take several people to hold him down, seven on one occasion. He broke out of a strait jacket during one fit, and out of a clothesline tied around him during another.
The violent stage generally lasted for 15 or 20 minutes or a half hour, and was followed by a period of confusion lasting anywhere from 15 minutes to several hours, during which time he could not be “reached”. When he came out of this confused state, he sometimes would remember nothing of what had transpired from the onset of the seizure through the period of confusion; at other times he would remember portions of what happened, such as shaking, swinging, passing out or throwing himself on the floor, hitting the floor with his hand, and people holding him down. He often asked what had happened and what he had done, and was provided with the details. He was taken to a hospital after most of these attacks, and both the civilian and military medical records diagnosed most of *614 the seizures as epileptic fits. As the trial court itself stated during the course of the trial, ‘ ‘ I take the liberty of saying that this defendant is an epileptic, according to the record; that is without any doubt ”.
Three medical experts testified for the defense: (1) Dr. John H. Taterka, a specialist in neurology and psychiatry. He was head of the epilepsy clinic at Bellevue Psychiatric Hospital, had treated thousands of epileptic cases, and was described by one of the other defense experts as “ one of the leading authorities on epilepsy in the world ”. (2) Dr. Albert A. La Verne, a specialist in psychiatry, but not a certified neurologist, whose qualifications included the position of senior psychiatrist at the Psychiatric Division of Bellevue. He had observed from 8 to 12 epileptic furor attacks during the course of his medical practice, and had treated some 200 or 300 epileptics. (3) Dr. Richard H. Hoffman, who had specialized in neuropsychiatry for some 40 years, had served, among other things, as psychiatric expert to four District Attorneys of Nassau County, appearing for the People in over 50 murder trials, and had observed at least six epileptic fits of the furor type.
These three experts examined defendant numerous times and, in accordance with recognized procedure for determining epilepsy, subjected him to a variety of physical, neurological and psychological tests. All these tests proved essentially negative, except for a condition of hyperinsulism (low blood sugar — direct opposite of diabetes), definite but mild evidence of intellectual deterioration and brain damage.
On October 11th, while the trial was in progress, they performed a so-called alcohol provocative test on defendant in Kings County Hospital. This was a “ standard test used in a suspected case of epilepsy ” and “ is what is called a provocative test in so far if the routine tests are negative [as they are in a substantial percentage of known epileptics] and we suspect epilepsy, then we use provocative agents for the purpose of triggering off a mild epileptic reaction ’ ’. It was accepted procedure to use alcohol as a provocative, and it was used here because defendant’s medical history showed that most of his seizures had occurred after drinking.
Defendant arrived at the hospital at about 2:45 p.m., and was placed in a half sitting position on a reclining chair. Electro *615 encephalograph equipment (hereinafter called EEG), designed to electrically record brain impulses and a standard procedure in epilepsy cases, was placed on his head. After a blood sugar test was made, he was given a mixture composed of 3 ounces of rye whiskey, 3 ounces of orange juice and 3 teaspoons of sugar. Thirty minutes later he was given a second mixture with the same ingredients.
■ Nine minutes after he drank the second mixture he suffered a seizure. His lips started quivering, his left hand began shaking and the EE-G wires came off his head. His whole body then went into motion and he slid partially off the chair. He then started shaking his head very wildly and banged it against the chair. He became so violent that four correction officers could not hold him down and had to handcuff one of his arms to the chair. He fought these and other officers and shouted and screamed unintelligibly. His pupils were dilated and his reaction to light was sluggish. After this violent state subsided, defendant was bewildered and dazed. It was not possible to communicate with Mm for some 30 minutes, and he was confused and exhausted. Defendant was unable to remember anything that had transpired during the violent phase of the attack or during the period of confusion that followed.
Dr. Taterka diagnosed the seizure suffered by defendant as “ a combination of a grand mal spell * * * followed by or combined with a spell of rage, of 'furor ”. He explained that there were four main types of epilepsy: (1) grand mal, or the convulsive type which is characterized by total amnesia and during which the individual is flat on his back, completely helpless and unable to perform any skillful or co-ordinated movements; (2) petit mal, which is a mild spell of brief duration prevalent in children; (3) psychomotor, during which the patient is out of contact but has seemingly purposeful movements, and (4) thalamic or hypothalamic epilepsy, which “is characterized by strange attacks, fitting in no one of these patterns mentioned, and * * * rage or fury attacks, wMch may be combined with a convulsion ”. This type of epilepsy, “ recognized as a special form ”, is so named because it involves the thalamus, a “ very important structure ” at the bottom of the brain, wMch “ transmits sensation, feelings of pain, and touch”, and “also has to do with emotional reactions”, *616 Although ‘ ‘ only recently studied ’ ’ and classified in medical literature under this name, there were a great many verified cases of such furor attacks, with some 427 cases reported in an authoritative text on epilepsy. In contrast with the grand mal or convulsive type, hypothalamic epilepsy may be characterized by partial as well as complete amnesia, with the individual sometimes able to partially recollect the seizure. During the violent stage of a hypothalamic attack, the individual is capable of performing skillful, co-ordinated movements and may, in his wild movements, aim skillfully.
In answer to hypothetical questions, each of the defense experts testified that he was reasonably certain that defendant suffered an epileptic attack of the hypothalamic type while in the back seat of the car with decedent, and that when he struck her with the hammer he was laboring from such a defect of reason as not to know the nature and quality of his act or that it was wrong. Dr. Hoffman was of the opinion that defendant’s condition of hyperinsulism triggered the epileptic attack, V showing itself in a form which did not take the convulsive form, but the form of cerebral agitation spreading through into the emotional centers, and depriving him of reason, and putting him into a reflex condition where he acted without thinking, without feeling and without knowing.”
Two expert witnesses, neither of whom had ever examined defendant, testified for the People in rebuttal: (1) Dr. Melvin D. Yahr, a neurologist specializing in epilepsy, Associate Professor of Neurology at Columbia Hospital College of Physicians and Surgeons and Associate Attending Neurologist at the New York Neurological Institute, who saw 30 to 40 epileptics almost every week and was, among other things, epilepsy consultant for the State of New Jersey. (2) Dr. David Abrahamsen, a neuropsychiatrist who considered himself a specialist only in psychiatry, who had been connected with epilepsy clinics in Europe in the 1930’s and considered himself an expert on epilepsy “ as so far is concerned with crimes or offenses ” and who, among other things, had written several books dealing with the treatment and rehabilitation of criminals.
In answer to hypothetical questions, Dr. Yahr testified that he “ can not say from that whether [defendant] did have a seizure at that time, no ” (while in the back seat of the car *617 with decedent), nor could he express an opinion on defendant’s sanity at that time, inasmuch as he was only a neurologist and not a psychiatrist. Dr. Abrahamsen, however, in answer to hypothetical questions, testified (1) that he did not believe that defendant had had an epileptic attack, and (2) that, when he struck decedent with the hammer, he knew the nature and quality of his act and that it was wrong.
As the trial court properly instructed the jury, it was incumbent upon the People to prove beyond a reasonable doubt that, at the time he committed the homicidal assault, defendant knew the nature and quality of his act and that it was wrong (People v. Kelly, 302 N. Y. 512, 515). In the context of this case this meant that the People had to prove beyond a reasonable doubt that, at the time he struck decedent, defendant was not in the throes of an epileptic furor attack, inasmuch as all the experts agreed that during such a seizure a person is incapable of forming an intent or premeditating, and since the uncontradicted. testimony of the defense experts was that a person suffering such an attack is laboring from such a defect of reason as not to know the nature and quality of his act or that it is wrong.
The People relied principally on two items as proof that defendant did not strike decedent during an epileptic furor attack: (1) that a person suffering such an attack would not be capable of picking up a hammer, inflicting at least 19 well-aimed blows to the face and head of the victim, and thereafter (a period of about 40 minutes) drive a standard shift car a substantial distance. Dr. Abrahamsen emphasized that returning to the front seat after having struck decedent, starting the car, shifting, driving around and disposing of the body were all “ coordinated events ” which “ would absolutely contradict a seizure or a fit of any type ”. (2) Defendant’s statements to the authorities, insofar as they evidenced a memory of how and why he hit decedent, were inconsistent with a prime characteristic of any type of epileptic fit, namely, an inability to remember what happened during the seizure. In this connection, Dr. Abrahamsen testified that if defendant had had a genuine epileptic fit he would not have remembered picking up the hammer and hitting decedent as he said he did, and Dr. Yahr attributed his inability to state whether defendant had had a *618 seizure partly to the fact that the assumptions in the hypothetical question evidenced a “ total recollection of a great deal of * * * events ” which “would be an unusual characteristic for anybody having a seizure ’ ’.
So far as item (1) is concerned, even the defense experts conceded that during a grand mal seizure the person is flat on his back (here he would be in the back seat of the car), completely helpless and incapable of performing any co-ordinated movements; Drs. Taterka and La Verne testified that during the early stages of the seizure they induced, defendant absolutely could not have picked up a hammer and inflicted 19 blows. The nature of defendant’s past attacks, however, and the uncontradicted medical testimony from the only doctors who examined him established that he suffered from a type of epilepsy known scientifically as thalamic or hypothalamic, or what Dr. Yahr, one of the People’s experts, termed “focal seizures ”, characterized by wild and violent attacks fitting into no coherent pattern. Dr. Yahr himself testified that the closest thing to a positive test in determining epilepsy was “ the witnessing of a seizure by a trained observer ”. During a hypothalamic seizure, the person is capable of performing skillful, co-ordinated movements, and both Drs. Taterka and La Verne testified that, in the furor stage of the seizure they observed, defendant could have picked up a hammer and “ skillfully directed it in attacking any person, myself, or a correction officer, because he had no way of knowing whom he was hitting.” During this stage,1 ‘ It was a question of restraining this patient, to keep him from injuring ffimself or hurting others ” (emphasis supplied), and this is borne out by the character of his past seizures, when it took as many as seven persons to hold him down. Moreover, at the time defendant was alleged to have suffered the seizure on the night of the crime, he was sitting in close proximity to decedent in the back seat of a car, and the pattern of his former attacks is consistent with his having struck out violently at her.
As early as 1889, in People v. Barber (115 N. Y. 475, 489-490), this court recognized that an individual was capable of committing a homicide during an epileptic furor attack, and that the defense of insanity “was one most proper to be urged, and required most deliberate and careful consideration.” (See, *619 also, People v. Furlong, 187 N. Y. 198, 207-208, 211.) The Barber case involved a violent assault upon two persons, followed by a burning of the house, in which they lay helpless, resulting in the death of one of them. The defense sought to establish that at the time of the assault and the setting fire to the house defendant 1‘ was under the influence of epileptic furor, caused by epilepsy, and that his acts were the unconscious and uncontrollable result of epileptic mania” (p. 488). To sustain the defense, evidence was introduced that defendant had an “ inherited predisposition to epilepsy ”, and had suffered violent epileptic attacks in his childhood, although not for 18 years preceding the commission of the offense in question (pp. 488-490). This court unanimously reversed the conviction of murder in the first degree and ordered a new trial. In light of this case, and on the basis of the expert testimony and other evidence in the record before us, the weight of the evidence supports the view that defendant was physically capable of picking up the homicide weapon and inflicting the deadly blows upon decedent during an epileptic furor attack.
The weight of the evidence also supports the view that defendant was capable, during the post-epileptic eonfusional state following such an attack, of returning to the front seat of the car and driving it to the street where he disposed of the body. Both of the People’s experts conceded that this eonfusional state could include automatic-type behavior, and Drs. Taterka and La Verne testified unequivocally that the driving of a car was an automatic, reflex-type activity which was consistent with the eonfusional state of an epileptic rage attack. Dr. La Verne stated that one could start, shift and drive a car without having “ all of his faculties functioning and intact ”, since it required only “ recall reflex, automatic movement and behavior ”, and that “ it has been demonstrated in humans and animals, that complicated coordinated movements are done reflexly ’ ’. And Dr. Taterka testified: “I have seen cases where, for example, a taxi driver drove right through a spell ” (emphasis supplied).
The evidence which the People contend was most damaging to the defense claim of an epileptic seizure related to defendant’s statements to the police, insofar as they evidenced a recollection of how and why he struck decedent. Although an epileptic *620 fit of the furor, as opposed to the grand mal, type may be characterized by a partial as well as a complete amnesia, and the testimony as to defendant’s prior seizures indicated that he remembered portions of what happened, all the experts agreed that a substantial recollection of what happened was inconsistent with defendant’s having suffered any type of seizure.
An examination of defendant’s statements, however, shows that he had anything but a clear memory of how and why he committed the homicide. The only aspect of the assault he seemed to remember was picking up a tool—which he thought “must have been ” the hammer shown to him by the police — and swinging it, after he started to shake, when a “ funny feeling” came over him and he felt a pounding in his head. He did not remember what part of decedent’s body he hit or how many times — “all I know I was swinging”. As to why he hit her, the one theme that constantly recurred was that he “ didn’t know why ”. In the first question and answer statement, taken some 2% hours after the initial oral statement, defendant denied that decedent had said she was going to tell anybody about their lovemaking. He did answer “Yes” to the question ‘1 If she got out of the car she would tell people she knew about it, did you know that? ”, as he did to several other damaging leading questions; but in answer to the very next question: “ With that thought in mind as well as being angry and disappointed,, you picked the hammer up, isn’t that it? ”, he replied: “ I wasn’t angry; it was a feeling that got over me; I started to shake ”.
In the second question and answer statement, taken about 2 hours later, and which defendant repudiated on the stand, he said he hit decedent because he was angry and 1 ‘ knew that she would know who I was and probably tell somebody ”. Immediately after answering “Yes” to the question: “ And you hit her sufficiently to stop her from telling anybody? ”, he was asked: “Do you understand what I said? ”, whereupon he gave the limited answer “ I hit her. Yes.” Then in reply to the question: “ Why did you hit her? ”, he returned to the ever recurring theme, “ I don’t know. I just picked it up and hit her. ’ ’
“If anything emerges clearly from ” defendant’s account of what happened, “ it is a picture of a defendant who is actually *621 unable to recall with any clarity the events about which he is being questioned ”, and “ The extreme artlessness of the language, with its obviously damaging overtones, suggests one probing the outposts of memory, rather than a man evasively revealing part and concealing the remainder of a story” (People v. Leyra, 1 N Y 2d 199, 207).
Although defendant testified that he had no memory of hitting decedent, his statements that he remembered swinging and hitting her are not necessarily inconsistent with his having suffered a hypothalamic fit. The testimony as to his past seizures showed that on at least one occasion he remembered “swinging”. The theory of the three defense experts was that he had had only partial amnesia, and, combining with this inference and suggestion from outside sources, had reconstructed what had probably happened, without having any actual memory of it. The People’s neurological expert, Dr. Yahr, “assumed it was possible” that a person, under the circumstances of this case, could, without actual memory, reconstruct what had happened and accept in his own mind the version as given him by the newspapers and the police. Defendant could of course recall all the events preceding his seizure; he subsequently learned that Patricia had been killed, he saw the blood spots in his car, and he could not help but conclude that he must have killed her.
Inasmuch as defendant’s “ memory ” of the actual assault was manifestly vague, and in light of the leading nature of many of the questions put to him and the fact that he was a high grade intellectual moron with an 80 I.Q., his statements as to returning to the front seat of the ear and driving it toward the “Nineties” seem to evidence a reconstruction of what probably happened, rather than a conscious recollection of events. He knew the girl had been in the car with him and actually remembered disposing of the body, after the screech of brakes and a near collision brought him back to a state of consciousness. The testimony as to his past seizures showed that he had been told of various acts of violence he had committed of which he had no memory, and here his interrogators confirmed what he had already learned from the radio and newspapers.
*622 His attempts to conceal the crime would have little if any probative force on the issue of whether he remembered what occurred. We emphasized the weakness of such evidence in the case of People v. Leyra (supra, pp. 208-210), and, under the circumstances here, the spoliation of evidence is just as consistent with a realization by defendant that he had done something to the girl as with a conscious recollection of precisely what had happened. His attempts to conceal the crime were rather cursory, unhurried and ineffective, and he made no effort to get rid of the most damaging piece of evidence, namely, the homicide weapon, which had bloodstains on it.
The fact that defendant inflicted at least 19 separate blows on the face and head of decedent reflects the uncontrollable rage pattern of an epileptic furor attack, rather than the premeditated action of a purposeful killer. The defense experts emphasized that the unusual violence thus displayed was suggestive of a furor attack. Dr. La Verne testified that a person in the throes of a furor attack “acts like a wild animal” (emphasis supplied), and Dr. Hoffman explained that “ a clonic reaction in an epileptic will make him hit, hit, hit, hit, hit, until the thing is over
Further evidence that defendant suffered a seizure was a ‘ ‘ tiny clue ’ ’ obtained by the defense experts after examining defendant under sodium amytal (popularly called truth serum), the validity of which they did not acknowledge but which gave them “ the determination to pursue [the] alcohol provocative test ” after the routine tests for epilepsy proved negative. During an amytal interview, as recounted by Dr. La Verne, defendant ‘ ‘ stated an actual description of an attack, and the way he described it was as follows: He was in the back seat with Pat Euland and she suddenly stated to him, 1 Tommy, why are you shaking? What’s wrong with, you? Are you sick? ’ He then grabbed my arm to demonstrate to me what she did to him. He grabbed my arm to steady—to apparently steady the arm that she had grabbed in the car * * *. She then stated to him, ‘ You’re talking crazy. You’re talking nonsense. What’s wrong with you?’” When defendant returned to consciousness he had no recollection of this conversation or of having suffered a spell in the car with, decedent. Dr. La Verne explained that while patients often give expres *623 Sion to an u unconscious wish or fantasy” during amytal interviews, defendant ‘ ‘ consistently gave the same answers Under amytal ”, although both he and Dr. Taterka “ spent about an hour or thereabouts trying to get him to change the description of that spell and trying to shake his story
Inasmuch as the trial court denied the prosecutor’s motion to strike this testimony from the record and ruled that the jury “ will consider it ”, it is part of the record before us and the People do not argue that the trial court’s ruling was in error. We find it difficult to ignore the fact that defendant always started “ shaking” at the outset of a seizure, and that every time anyone tried to help him he struck out violently at him.
Another suggestive feature of defendant’s epileptic history is that almost all of his attacks were preceded by drinking and nothing to eat. Whether defendant had 15 to 20 beers only on the night of the homicide, or, as he claimed, they were “ chased ” by an equal number of ryes, he still had quite a bit of alcohol in his system and had had nothing to eat since 11 o’clock in the morning. In the alcohol provocative test, defendant was given a lesser amount of alcohol than he claimed to have consumed on the night of the homicide, and Dr. Taterka testified that he would not have proceeded any differently in administering the test if defendant had had only beer. There was little doubt that the seizure induced in defendant was a genuine epileptic furor attack, as ‘ ‘ nobody, not even an expert, could simulate a hypothalamic attack ’ ’. Moreover, dilation of pupils and sluggishness to light could not “be simulated”. While Dr. Tahr testified that medical science did not know what caused epileptic fits, Dr. Taterka stated: “ There are many epileptics who will get spells most or only after alcohol. ’ ’
Finally, we come to the question of motive, proof of which in this case is inextricably bound up with proof of sanity and premeditation. As we said in the Barber case (115 N. Y. 475, 490, supra), “the question of motive was manifestly a most important consideration on the issue of insanity”, and we further noted (p. 486): “ It is a striking feature of the case, which arrests the attention at the outset, that no motive for the murder * * * was shown, and, indeed, that no reasonable suggestion of such motive is discoverable from the evi *624 dence.” The motive sought to be established by the People here appeared to be a combination of anger and disappointment because decedent refused to consummate their lovemaking by an act of intercourse at a time when defendant was in an extreme state of sexual excitement, and the desire to prevent decedent from telling anyone about their amorous adventure. This dual motive is reflected in the testimony of Dr. Abrahamsen who, at one point, explained defendant’s action in hitting the girl as “ a reaction of frustration because he did not get what he wanted ”, but then testified that defendant “ Was in a very precarious situation, by the fact of trying to have sexual intercourse. The girl would know him and would have told on him.”
On this appeal, the People rely solely on the second motive, as they argue that in the second question and answer statement ‘ ‘ he abandoned the futile effort to attribute the murder to passion or impulse and fully confessed that he had killed the girl with the intent and for the purpose of preventing her from disclosing to mutual acquaintances their amatory encounter * * * and his conduct therein.” (Emphasis in original.)
That defendant killed decedent to prevent a disclosure — as to which there is not the slightest evidence she ever threatened to make — does not strike us as plausible under the circumstances of this ease. Had defendant attempted to rape her, or if she was forcefully resisting his sexual advances, then his desire to prevent disclosure might arguably be a motive for murder. But the autopsy, as noted, showed no evidence of abrasions, contutions or semen around decedent’s genitalia, and the only evidence in the record of what transpired between the two in the car has already been referred to.
As noted, when decedent was found on the street at about 11:30 p.m., she was moaning and moving her arms and legs, and the woman who discovered her noticed a green car up ahead making a turn. Inasmuch as decedent entered defendant’s car about 10:25 p.m. and defendant stated that their lovemaking consumed about 20 minutes, it seems likely that the car observed was defendant’s green Ford. If defendant sought to make sure that decedent would not inform on him, one finds it difficult to explain why he would first inflict 19 blows and then leave his victim on a public street obviously alive.
*625 Of course we cannot presume to say what motivates one to commit murder, for as we noted in People v. Furlong (187 N. Y. 198, 210, supra), “There can be no sufficient motive for so brutal and serious a crime Had defendant clearly and unequivocally attributed his act to a desire to prevent disclosure, we could not completely discount this as inherently improbable or unbelievable. The only evidence of this motive, however, appears in a few equivocal answers in the second question and answer statement, prior to which an Assistant District Attorney had admittedly accused defendant of lying and implored him, as a good Catholic, to “ confess ”, as he would have, to said assistant’s uncle, a Catholic priest known to defendant. It was this interrogator who first suggested the possibility that defendant killed the girl to silence her, during the taking of the first question and answer statement, but defendant denied it. In answer to obviously leading questions in the second statement, he replied, in almost the identical language used earlier by his interrogator, that this was the reason he struck her, but then immediately reiterated that he didn’t know why — he “ just picked it up and hit her ”. As we noted in the Leyra case (1 N Y 2d 199, 207, supra), “ these feio equivocal sentences are too weak and slender a reed upon which to support a judgment sending a man to the electric chair. ” (Emphasis supplied.)
The People cite the very brutality of the crime as probative of premeditation, relying upon a quotation from People v. Furlong (187 N. Y. 198, 210, supra). In that case, however, the defendant had provided himself with an iron bar, taken it to the apartment in question, and used it to commit the crime, the motive for which was clearly robbery. Here, as in the Barber case (115 N. Y. 475, 488, supra), “ There was apparently no preparation to commit the crime ”, as the hammer was always kept loose on the car floor in front of the back seat, along with other tools of defendant’s trade, and “ The evidence tends to show that he picked up the first implement at his hand with which to make the assault ”.
People v. Egnor (175 N. Y. 419) involved a homicidal assault by a convict upon a prison guard who “ had been severe and harsh in his treatment of the convicts under him ”, and towards whom defendant “ had manifested a vindictive and threatening *626 demeanor ” (p. 422). Immediately after assaulting his victim with an iron bar and then shooting him with a revolver, the defendant informed another prison guard what he had done — conduct totally inconsistent with the post-confusional state which generally follows the violent stage of an epileptic furor attack. Furthermore, the testimony of witnesses who observed the homicide, as well as those who observed defendant immediately before and after, ‘ ‘ tended to show an utter absence of any indications of epileptic disease ” (p. 424). The medical experts who testified for the People had examined defendant, had found no evidence of epilepsy or epileptic furor, and had testified that defendant ‘1 appeared to be controlling his muscles ” during the physical examination (p. 424).
Here, in sharp contrast to Egnor, there was no reasonable suggestion of a motive, and no eyewitness testimony as to defendant’s conduct during or after the alleged attack. Defendant’s actions after the homicide were consistent with the postconfusional state of a furor attack, and the only doctors who examined him and had actually induced a seizure testified that he presently suffered from thalamic or hypothalamic epilepsy, which “ nobody, not even an expert, can simulate ”.
Our Constitution (N. Y. Const., art. VI, § 7) and section 528 of the Code of Criminal Procedure have vested in us the power to review the facts in a capital case, and that means “ that we shall examine the evidence to determine whether in our judgment it has been sufficient to make out a case of murder beyond a reasonable doubt” (People v. Crum, 272 N. Y. 348, 350; People v. Valletutti, 297 N. Y. 226, 231; People v. Williams, 292 N. Y. 297, 300; People v. Weiss, 290 N. Y. 160, 170; People v. Davino, 284 N. Y. 486, 488; see, also, People v. Becker, 210 N. Y. 274, 289). In the exercise of that power, and in the discharge of our duty “ to weigh the evidence and form a conclusion as to the facts ” (People v. Crum, 272 N. Y. 348, 350, supra), we have concluded that the conviction must be reversed and the jury’s verdict set aside. The finding that the defendant was sane at the time he is alleged to have committed the crime, as well as the finding of premeditation and deliberation, implicit in the jury’s verdict is, upon this record, contrary to the weight of the evidence.
*627 There is a further ground for concluding that there must be a reversal, namely, certain errors committed by the trial court which we regard as prejudicial. One such error was permitting the People’s two expert witnesses to invade the province of the jury and testify to matters not properly the subject of expert testimony. A clear example of this was when the court itself inquired of Dr. Yahr whether concealment by a person of physical evidence some hours after the epileptic seizure would “ indicate to you that he has a recollection of what had transpired before? ” Over the objection of defense counsel, the court persisted in repeating the question, and the witness was allowed to answer “Yes”, whereupon the court denied a motion to strike the answer. The court then asked: “Is that inconsistent with the symptoms and characteristics of a grand mal seizure? ” (emphasis supplied), and, over the objection of defense counsel, the witness was again permitted to answer “ Yes ”. No reference was made to hypothalamic or furor epilepsy.
In the Barber case (115 N. Y. 475, 491-492, supra), an expert witness was similarly allowed to testify that certain acts performed by defendant after the crime indicated that he had a conscious recollection of committing the crime which was inconsistent with his having suffered an epileptic furor attack. In ruling the questions and answers improper, we held (p. 492) that the “inferences to be drawn from the facts referred to in the questions were matters for the jury * * * and were not the subject of expert testimony”.
The above questions were particularly prejudicial because, at several other points in the trial, the court highlighted defendant’s attempts to conceal the crime and, in recounting Dr. Yahr’s testimony in its charge, it included the statement: 1 ‘ Efforts by a person to conceal physical evidence of things which allegedly occurred during the attack indicates that he has a recollection of what had transpired ’ ’. Thus, matters which had little if any probative value on the issue of insanity or premeditation might well have achieved a prejudicial significance in the minds of the jury.
Another instance of improper expert testimony, admitted over the vigorous objection of the defense, was Dr. Abrahamsen’s remarks (referring to the time when defendant made the state *628 ments to the authorities): “ I believe he was very anxious to clean his breast” and “these feelings of guilt indicate very clearly that this man remembered very well what he had been doing ”. This testimony was objectionable for the same reasons specified in the Barber, case {supra), despite an effort to dress it up as an opinion which only an expert was qualified to give (see, also, People v. Creasy, 236 N. Y. 205, 221-222).
Another error committed by the trial court which we regard as prejudicial is that he several times inaccurately informed the jury, both during the trial —over repeated objections by the defense — and in his charge, that Dr. Yahr had testified that defendant was not in the throes of an epileptic seizure at the time of the fatal assault. As heretofore pointed out, Dr. Yahr, in answer to a hypothetical question, had stated: “ I cannot say from that whether he did have a seizure at that time, no.” (Emphasis supplied.)
The only expert opinion that defendant did not suffer an epileptic seizure was that of Dr. Abrahamsen, who specialized in psychiatry and not neurology, and who so far as appears had not worked extensively with epileptics since the 1930’s. Dr. Yahr, on the other hand, was a neurologist who specialized in epilepsy, and his opinion on this question might thus have been considered more persuasive by the jury and accorded greater weight. The issue of insanity in this case ‘ ‘ required most deliberate and careful consideration” People v. Barber (supra, 115 N. Y., at pp. 489-490). By erroneously informing the jury that the People’s neurological expert had concluded that defendant did not suffer a seizure, the court may well have tipped the balance against defendant. This was crucial, for all the experts on both sides agreed that if defendant had a seizure he would have been unable to form an intent or to premeditate.
Another serious error in the charge occurred when, in recounting the testimony of Dr. Yahr, the court attributed to him the statement that the alcohol 1 ‘ provocative test may produce the same effect in normal people as it does in epileptics ”. Dr. Yahr did not so testify. What he did say was that “ alcohol was capable of producing abnormal brain waves in normal people [as well as epileptics] so that again you would have the difficulty of a test that does not have reliability” (emphasis *629 supplied). He was obviously referring to the EEG test that took place simultaneously with the alcohol provocative test but was entirely independent thereof; indeed, the EEG test established nothing for the wires came off defendant’s head when he suffered the seizure. Dr. Taterka agreed with Dr. Yahr that the EEG test could produce abnormal recordings in normal people. The uncontradicted medical testimony as to the provocative test, however, showed that it was not “ scientifically possible to induce an attack in a nonepileptic or a normal person ” with the amount of alcohol administered to defendant.
The observance of the seizure induced in defendant was a significant factor in the diagnosis made by the defense experts, and in their conclusion that on the night in question it was reasonably certain that he had suffered the same type of seizure. Furthermore, the prosecutor in his summation had characterized defendant’s reaction to the provocative test as that of a “ fighting drunk ”, and stressed the fact that all but two of defendant’s alleged epileptic attacks came after heavy drinking. The erroneous statement by the trial court not only cast doubt upon the defense testimony that the induced seizure was a genuine epileptic furor attack, but seriously undermined the probative force ■ of the expert opinions that defendant was legally insane. At least it might well have had such effect in the minds of the jury, and, viewed in this light, was most damaging to defendant.
Among other errors assigned, which we do not deem necessary to review, is the court’s failure to charge the jury, with the consent of defense counsel, that, in passing on the issues of intent, premeditation and deliberation, they could consider the defendant’s state of intoxication at the time of the homicide. Some of the members of the court are of the opinion that this too was prejudicial error, but, inasmuch as consideration of that question might lead to a difference of opinion among the majority, I shall express no view either way in this opinion.
The judgment of conviction should be reversed and a new trial ordered.