THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN WILLIAMS, Appellant.

Argued January 18, 1944; decided April 13, 1944.

*Alexander I. Rorke, Le Roy Campbell* and *Stanley S. Katzenstein* for appellant. I. Defendant was deprived of his right to a fair trial by the concealment of the names of witnesses by the District Attorney on the selection of the jury. (*People* v. *Hughes,* 137 N. Y. 29; *People* v. *Grieco,* 266 N. Y. 48; *The People* v. *Casey,* 96 N. Y. 115; *People* v. *McQuade,* 110 N. Y. 284; *People* v. *Hull,* 251 App. Div. 40; *Gulf & Railway Co.* v. *Shane,* 157 U. S. 348; *Hildreth* v. *City of Troy,* 101 N. Y. 234; *Searle* v. *Roman Catholic Bishop,* 203 Mass. 493; *McHugh* v. *Jones,* 258 App. Div. 111, 283 N. Y. 534; *People* v. *Rosen,* 251 App. Div. 584, 275 N. Y. 627.) II. Defendant's guilt was not proven beyond a reasonable doubt. (*People* v. *Spickler,* 255 N. Y. 408; *People* v. *Davino,* 284 N. Y. 486; *People* v. *Seppi,* 221 N. Y. 62; *People* v. *Nitzberg,* 289 N. Y. 523; *People* v. *Florina,* 232 N. Y. 545; *People* v. *Buchalter,* 289 N. Y. 181; *Viereck* v. *U. S.,* 63 S. Ct. R. 561; *People* v. *Watson,* 216 N. Y. 565; *People* v. *Manganaro,* 218 N. Y. 9; *People* v. *Slover,* 232 N. Y. 264.)

*Frank S. Hogan, District Attorney (Stanley H. Fuld* and *Ferdinand J. Wolf* of counsel), for respondent. I. The defendant's guilt was proved beyond a reasonable doubt. (*People* v. *Deitsch,* 237 N. Y. 300; *People* v. *Croes,* 285 N. Y. 279; *People* v. *Jackson,* 182 N. Y. 66; *Wilson* v. *United States,* 162 U. S. 613; *People* v. *Peller,* 291 N. Y. 438; *People* v. *Buchalter,* 289 N. Y. 181; *People* v. *Goldstein,* 285 N. Y. 376; *People* v. *Arata,* 255 N. Y. 374; *People* v. *Becker,* 215 N. Y. 126; *People* v.

*Seidenshner,* 210 N. Y. 341; *People* v. *Driscoll,* 107 N. Y. 414.) II. The defendant's right to a fair and impartial trial was not impaired by the district attorney's failure to name some of the People's witnesses before the trial. (*People* v. *Dally,* 174 Misc. 830; *People* v. *Nationwide News Service, Inc.,* 172 Misc. 752; *People* v. *Beyer,* 163 Misc. 890; *People* v. *Mitchell,* 266 N. Y. 15; *People* v. *Cosmo,* 205 N. Y. 91; *Snyder* v. *Massachusetts,* 291 U. S. 97.)

LOUGHRAN, J. This defendant, a colored man thirty-one years old, has been sentenced to death for the murder of Mrs. Aslee Edmond, a colored woman of like age. Early on the morning of December 6, 1942, her body was found upon a landing underneath a stairway leading upward from the first floor of a tenement house in the Harlem district of the city of New York. An autopsy exposed fifteen scattered stab wounds, one of which went through her heart and caused death. Her clothing was disarranged, but no trace of semen was discovered.

Neither Mrs. Edmond nor the defendant lived in the premises where her body was found. Her relatives and acquaintances swore they never saw him until after her death. He and members of his family swore he was at home during the time in issue.

Conspicuous among the prosecution witnesses were Arthur James and Emilio Funicello. They gave testimony that the defendant had repeatedly confessed his guilt of this crime to them at a time when all three were confined in a so-called house of detention which in fact was a district prison of the city of New York. In respect of this testimony of James and Funicello, the Trial Judge in his charge said to the jury: " If you come to the conclusion that the defendant did not admit to either of the witnesses James or Funicello that he stabbed and killed the deceased — that is, if you are not satisfied beyond a reasonable doubt that he made the admission or confession that he stabbed and killed Aslee Edmond to either of these two witnesses, then I charge you as matter of law that you cannot convict the defendant of any crime and that you then should acquit him." In line with that instruction, the verdict of guilty must now be taken to have been reached upon the basis of an acceptance by the jury of the story of James and Funicello.

Hence the first question is whether the testimony of these two witnesses is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt (*People* v. *Crum,* 272 N. Y. 348, 350; *People* v. *Weiss,* 290 N. Y. 160, 170. See *People* v. *Becker,* 210 N. Y. 274, 313).

The defendant was held in the house of detention from the day of this crime (December 6, 1942) until he was put on trial on May 12, 1943. During that period, the witness James was sojourning in that house as a stool pigeon, though he was supposed to be then in a State prison under a sentence of from ten to twenty years for robbery committed as a second offender. The trial of this defendant was the third occasion on which James had made to a court of justice a testimonial report of an alleged oral confession of an accused. In respect of James' present evidence, the Trial Judge said: '' We have now the testimony that he does not expect any hope of reward. He is testifying because some public spirit moved him.''

The witness Funicello had been an under-cover man in the same house of detention from as far back as November, 1937, though he had been sentenced in 1932 to a State prison for the term of his natural life upon his conviction of robbery committed as a fourth offender. He, too, is a seasoned reporter of oral admissions of high criminal guilt and he can boast of no less than a thousand felonies of his own. (See *People* v. *Feolo,* 282 N. Y. 276.)

James and Funicello quoted the defendant as having told them he knew Mrs. Edmond in Brooklyn when she lived there prior to her removal to Manhattan some nine or ten months before she was killed. Mrs. Edmond's fifteen year old daughter, who had always lived with her, did not remember ever having lived in Brooklyn. James and Funicello quoted the defendant as having told them he took several dollars out of the pocket-book of Mrs. Edmond after he stabbed her. Mrs. Edmond had no pocket-book with her when she left home on the night before her death, or so her daughter testified. James and Funicello quoted the defendant as having told them he had immediately traded away his overcoat after killing Mrs. Edmond. There is in evidence an apparently trustworthy business record of a sale on November 27, 1940, to the defendant

of the overcoat that he was wearing when he was arrested on the day of the killing — December 6, 1942.

According to Funicello, the defendant's confessions to him were recited in the privacy of Funicello's cell without hindrance by the keepers, although a rule of the house of detention forbade any inmate to enter the cell of another. If Funicello is to be credited, the defendant seemingly was solicitous lest he fall short in an endeavor to vouchsafe his guilt of a wholly unjustified homicide of the gravest degree. Indeed the defendant (so Funicello said) went so far on one occasion as to make for Funicello a sketch of the place where Mrs. Edmond met her death and indicated thereon — among other things — the position of the body of Mrs. Edmond under the stairway, the location of a nearby ceiling light and the presence on the stairway of a woman. This draftmanship (so Funicello said) was undertaken by the defendant subsequently to a time when the defendant had upbraided Funicello for having reported to the District Attorney earlier admissions of the defendant.

The woman so referred to by Funicello came into sight at the trial when the People called to the witness stand a seventeen year old girl of sorry repute. Her testimony was that early on the day of the homicide she saw the defendant in the tenement house hallway where the body of Mrs. Edmond was thereafter found. This witness (who lived on the premises) said she had then and there stopped and that the defendant thereupon had stood still while they gazed at each other " for a minute." This witness also said: " I looked at his face. I didn't see any blood. He was brushing off his coat. He didn't say anything to me."

Later on that same day of the homicide, the same witness identified the defendant to the police as the man she had seen in the tenement house hallway just before the finding of Mrs. Edmond's body there. In respect of the preliminaries of that identification, a first-floor tenant of the building testified in behalf of the defendant as follows: " Well, the policeman brought the defendant — the policeman brought the man to our door and they asked the girl to identify him. She stood at the door and looked at him between twenty and twenty-five minutes. She didn't say anything." The layout of the hall-

way in question and the claimed existence of an identification witness had thus been impressed on the defendant after the homicide had been committed and consequently the report by James and Funicello of the defendant's awareness of these facts is in any view of it of quite dubious significance.

On the whole, we cannot see in the testimony of James and Funicello a sufficient basis for the signing of a warrant for the death of this defendant.

This court must now say a word in criticism of the trial prosecutor. In his summation, he said to the jury: "I don't know what percentage, gentlemen, of the crimes in this town, in this state, in this country, in this world would ever be solved without the testimony of informers. We are entitled to use those persons. The age of chivalry is gone. The days when knights in armor, men on the field of battle, played the games according to the rules of football or boxing are over and forgotten. There are no rules of the game when you are investigating a crime, or when you are trying to find out and prove the guilt of a defendant."

These sentiments, of course, were inexact. There is a canon that calls for candor on the part of every lawyer in his conduct before the courts. From that viewpoint, the trial prosecutor erred when in his opening statement to the jury panel on this trial he concealed the identity of James and Funicello by referring to them as " two other witnesses who I am sure you gentlemen do not know." This was not right because the trial prosecutor then knew that three members of the panel (who later were accepted as trial jurors) had served on the jury in other capital cases in which Funicello had been a prosecution witness. This defendant was in fairness entitled to be informed on that score at the time of the selection of the jurors who were to say whether his guilt was proved by Funicello's testimony.

For the sake of justice according to law, it may be worth while to add that persons detained for trial on criminal charges or as witnesses should not be put or kept in the same room with convicts under sentence. (County Law, § 92. Cf. Code Crim. Pro. § 618-b.)

The judgment of conviction should be reversed and a new trial ordered.

THACHER, J. (dissenting). There was overwhelming proof of defendant's guilt in the testimony of four witnesses, — James and Funicello, who testified to the defendant's confessions; the Coombs woman, who testified she saw the defendant enter the hallway of the premises at 66 West 139th Street, New York City, with the deceased, who very shortly thereafter was found dead under the stairway leading from this hallway, and the Williams girl, who testified she saw him at the foot of this stairway under which the deceased lay dying as he left the building. The trial court instructed the jury to acquit unless the testimony of James or Funicello was accepted as true. The jury found the defendant guilty of murder in the first degree. The decision of the court reversing the judgment of conviction is put upon the ground that the testimony of James and Funicello is not " of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt ". We are unable to concur in this decision because of the rulings of this court in *People* v. *Peller* (291 N. Y. 438); *People* v. *Buchalter* (289 N. Y. 181, 230), and *People* v. *Becker,* 215 N. Y. 126). In voting to affirm a judgment of conviction in *People* v. *Buchalter* (289 N. Y. 181), LEHMAN, Ch. J., said (at p. 230): " Evidence coming from a polluted source has failed to remove reasonable doubt of the defendant's guilt from my mind. All that is immaterial, if the jury is convinced of guilt on sufficient evidence and no errors and defects affected the verdict." This ruling of the Chief Judge was implicit in the affirmance of the judgment of conviction in that case by a majority of the court, and in *People* v. *Peller* (291 N. Y. 438, 446) this statement of the rule was confirmed by the court.

In *People* v. *Becker* (215 N. Y. 126) the rule was applied to a situation strikingly similar to the situation presented in this case. There Rose, Webber and Vallon employed the gunmen who killed Rosenthal and the question was whether or not the defendant instigated them to hire the assassins. Admitting their complicity in the murder, these accomplices having been promised that they would go free, provided they did not actually fire the shots, testified that they were set in motion by Becker, and his guilt depended on the truth or falsity of their testimony. Indeed the jury was instructed " if the jury disbelieve the

testimony of Rose, Webber and Vallon in its main essential features, they must acquit this defendant '' and this court held that there could be no conviction of the defendant unless the jury believed the testimony of the three accomplices. Dealing with the correlative duties of court and jury in this situation, Chief Judge WILLARD BARTLETT, writing the opinion of the court, said (p. 136): '' Extensive as is the power of review vested in this court on an appeal from a judgment of death, the law does not intend to substitute the conclusions of fact which *may* be drawn from the evidence by seven judges for the conclusions of fact which *have* been drawn from the evidence by twelve jurors, unless we are clear that the view of the facts taken by the jury is wrong. It is our duty to affirm, if the trial was fair and without legal error and the verdict was not against the weight of evidence. We are to see to it that the trial was fair and that there was sufficient evidence, within recognized rules of law, to support the verdict; this done, the responsibility for the result rests with the jurors.'' (Italics in the original.)

Characterizing the witnesses, the court said (p. 140): '' Of course these accomplices were very bad men; accomplices in murder always are; but it is almost a truism in criminal law that if the testimony of bad men were absolutely rejected many murderers would escape the punishment which they deserve.''

And in concluding its opinion the court said (p. 158): '' We desire that the views which lead us to affirm this judgment shall be made unmistakably clear. Doubtless, a very strong argument can be made in favor of the defendant, based upon the inducement of the avowed accomplices to swear falsely, their opportunity to fabricate evidence, and the lack of conclusiveness in the corroboration. All this, however, was a question for the jury with whose determination we are not justified in interfering unless we can say that it was plainly wrong — which, as already stated, we cannot say. Therefore, unless the rules of law which have heretofore governed the disposition of criminal appeals are to be changed merely because there might have been a refusal to convict on this evidence, we think (1) that they required the submission of the issues of fact to the jury; (2) that the case was fairly and impartially tried; (3) that no

errors of law were committed prejudicial to the defendant, and (4) that the verdict cannot be deemed to be against the weight of evidence or against law within the meaning of section 528 of the Code of Criminal Procedure. It is not our duty to try the case over again upon the printed record. We have not seen the witnesses. We are deprived of the aid furnished by their appearance, demeanor, facial expression and manner of testifying. These advantages the jury enjoyed; and there being sufficient evidence in quantity and quality to take the case to the jury, their verdict, in the absence of any of the statutory grounds for reversal, is conclusive even upon the Court of Appeals."

Unless it can be said that the conduct of the trial was unfair and prejudicial to the rights of the defendant, these rules seem to require affirmance. We agree with Judge LOUGHRAN's comments on the sentiments expressed by the prosecutor. They were worse than " inexact " and his lack of candor may not be condoned. His failure to disclose the names of witnesses who it turned out were known to some of the jurors was equally deplorable; but we do not think that such conduct rendered the trial unfair or in any way prejudiced the jury's fair and dispassionate consideration of the issues.

There is a further consideration of the evidence in this case which seems to require affirmance. If the testimony of the Coombs woman or the testimony of the Williams girl was believed by the jury, the defendant's alibi was demonstrably false. The verdict of guilty imports such a finding. From this situation it follows that in order to set aside the verdict we must not only reject the testimony of James and Funicello as unworthy of belief but the testimony of Williams and Coombs as well. We are unable to find any basis within our competence for concluding that the verdict was against the weight of the evidence.

The judgment of conviction should be affirmed.

LEHMAN, Ch. J., RIPPEY and CONWAY, JJ., concur with LOUGHRAN, J.; THACHER, J., dissents in opinion in which LEWIS and DESMOND, JJ., concur.

Judgment of conviction reversed, etc.