Chief Judge Breitel.
Defendants De Tore and Wedra were convicted, after a jury trial, for the murder of De Tore’s wife. Bach received a sentence from 25 years to life imprisonment. They appeál. De Tore, involved with another woman, allegedly arranged through an intermediary to pay $9,000 for the killing. Wedra, unknown to De Tore, allegedly was the hired killer.
The principal issue is the sufficiency of the evidence against the killer Wedra. Also urged as error was the failure of the prosecutor to produce the intermediary, one Gasperino, -after describing in his opening statement how Gasperino would implicate Wedra. De Tore had previously confessed but on the trial disclaimed his confession. He explained that he had never intended to and did not confess to the planned killing of his wife. He also argued that his statement was obtained after a long and improper delay between his first being questioned by the police and his arrest. In addition, he seeks a reversal because of the failure to prove the killing by Wedra.
There should be an affirmance. A fellow inmate in Wedra’s cellblock testified, albeit only after denial and recantation, that Wedra had admitted the killing. It was a fair jury issue to assess the inmate’s credibility. Moreover, there were several inconclusive circumstances tending to implicate Wedra. Hence, there was sufficient evidence to sustain Wedra’s conviction. The case against De Tore, on any view of the evidence, is invulnerable on appeal.
Whether the failure to produce as a witness the intermediary Gasperino, although his testimony was foretold in the prosecutor’s opening, would have required a mistrial if either defendant had moved for one, lay within the trial court’s discretion. In any event, the failure of either defendant to move for a mistrial puts the question beyond review. Of the other asserted errors, few merit extended discussion.
De Tore’s wife of 29 years was found dead in the couple’s . Westchester County home in November, 1968. She had been shot twice, in the head and chest, and strangled. The body was found on her bed, naked from the waist down, with legs apart, suggesting a sexual assault, and . the bedroom had been ransacked, suggesting a larceny.
Four days after the killing De Tore admitted to the police his involvement with another woman, whom he had promised *205 to marry. Two days later, when confronted with large withdrawals from several bank accounts, he attempted suicide. Finally, less than two weeks after the killing, in writing and orally, De Tore admitted an arrangement on payment of $9,000 for Gasperino to “ solve all [his] problems.” He was still not arrested for another two days during which he led the police to others implicated in the plot.
De Tore, by his confessions, stated that he had been under increasing pressure from his mistress "to divorce his wife. De Tore met one Nicholas Gasperino who said he could “ solve all [his] problems ” for $9,000. Gasperino was to hire experienced men for the task. De Tore met Gasperino at a diner in Yonkers, paid him $5,000 in cash and gave him a key to the back door of the De Tore home. This was six days before the killing.
The People’s case against Wedra, allegedly hired by Gasperino to do the killing," hinges upon the testimony of Bruno La Spina. La Spina and Wedra, friends for 20 years, had been in the same cellbloek in Westchester County Jail for a week. La Spina, an admitted drug addict, was being held on a burglary charge. He testified that Wedra admitted to him in jail that he committed the killing by arrangement with Gasperino.
Defendants attack La Spina’s testimony because on the witness stand he had first denied, on direct examination, that Wedra had made any admission to him. Instead, he said that Wedra had told him only that he had not committed the homicide and was being framed. He further said that he had been previously coached by the police to inculpate Wedra.
While La Spina was still undergoing redirect examination, and after the luncheon recess was taken, the Trial Judge, out of the presence of the jury, ordered all spectators searched. La Spina then resumed the witness stand and recanted his earlier testimony. He now testified that Wedra had admitted the killing. La Spina said that he and his family had been threatened and for that reason he had lied on direct examination.
Before the trial had begun the People had not known of La Spina as a witness. He had only come forward with his testimony during the trial. The intended key witness was the intermediary, Gasperino, who had allegedly received money from De Tore and hired Wedra to do the killing. (It was appar *206 ently Gasperino’s testimony before the Grand Jury that had implicated Wedra.) The prosecutor, in his opening, said that Gasperino would testify arid that the prosecutor would trace the house key and the money to Wedra. When called as a witness, however, Gasperino, out of the presence of the jury, invoked his privilege against self incrimination. No motion was ever made for a mistrial on the ground that Gasperino had never testified on the trial. The jury was instructed to draw no inference, favorable or unfavorable to defendants, from Gasperino’s failure to testify.
La Spina’s testimony inculpating Wedra, though crucial, did not stand alone. There was testimony by three high school girls that they saw two men enter the victim’s house at about the time of the killing. Although she could not pick Wedra out of a lineup, one of the girls testified that Wedra looked “ similar ” to one of the men. Most harmful to Wedra’s case was the presence of his automobile across the street from the victim’s home, its motor running, only five days before the killing. One prosecution witness, who had been visiting a neighbor of the victim that day, had actually recorded the license plate number of the Wedra car, registered in his sister’s name but owned by Wedra.
Wedra. did not take the stand. He sought to establish, as an alibi defense, that he had been at home in The Bronx attending a birthday party for his three-year-old daughter. De Tore, on the other hand, did testify. He admitted he had agreed to pay Gasperino $9,000, but denied that the purpose was to kill his wife. Instead, according to De Tore, $5,000 was to be used to accomplish the silencing of his importunate mistress, either by buying her off or intimidating her, and the remainder was to compensate Gasperino for his trouble. On cross-examination, De Tore admitted he had been unfaithful to his wife during the last 23 of the couple’s 29 years of marriage.
Unless the evidence against Wedra is insufficient as a matter of law, there must be an affirmance. Questions of fact — the credibility of La Spina, the weight of the evidence — are all beyond review in this court. Such questions are properly left to the triers of fact, who are able and entitled to assess, at first hand, the credibility and reliability of the witnesses (see, e.g., *207 People v. Cerullo, 18 N Y 2d 839, 841; People v. Lobel, 298 N. Y. 243, 251; see, generally, Cohen and Karger, Powers of the New York Court of Appeals, p. 742).
Moreover, solely because La Spina changed his testimony on the trial, his ultimate testimony is not incredible as a matter of law. La Spina explained that he had been threatened. It was for the triers of fact to assess all relevant circumstances and decide whether or not to credit that explanation or any of the versions in La Spina’s testimony.
Defendants rely on People v. Ledwon (153 N. Y. 10, 20-22) for the contention that shifting testimony by the same witness, alternating between inculpation and exculpation, is insufficient as a matter of law to establish guilt beyond a reasonable doubt. The rule of the Ledwon case is sound, but is not applicable. In the Ledwon case, there was no reliable basis offered to the jury to explain the shifting testimony; there was only the testimony of a 12-year-old boy who four times contradicted his own eyewitness versions about his father’s death. In this case, on the contrary, there was the one substantial recantation with the witness explaining his reasons for the change, reasons that the jury was entitled to accept or reject.*
Of the failure to produce Gasperino, it happens not infrequently that a prosecutor is unable to prove every statement made in his opening especially when he must rely on criminal characters. But the general rule is that, absent bad faith or undue prejudice, a trial will not be undone (see, e.g., Frazier v. Cupp, 394 U. S. 731, 735-736, affg. 388 F. 2d 777, 779; United States v. Woodring, 446 F. 2d 733, 736-737; United States v. Mason, 440 F. 2d 1293, 1299, cert. den. 404 U. S. 883; see, also, Ann., Prosecution — Opening Statement, 28 ALR 2d 972, 974). Whether the unfulfilled representations in an opening should require a mistrial rests within the discretion of the trial court (Mares v. United States, 409 F. 2d 1083, 1085, cert. den. 394 U. S. 963). The jury was properly instructed that they should consider only the evidence in the case and that no inferences of any kind were to be drawn from the failure of Gasperino to *208 testify. Those instructions minimized or negated the prejudice, if any, from the prosecutor’s unfulfilled opening.
In any event, the failure of defendants to move for a mistrial renders their contentions with respect to Gasperino’s failure to testify beyond review in this court (cf. CPL 470.05, subd. 2). Moreover, the determination of the issue is properly in the discretion of the trial court, as noted earlier. It might be, too, that defense counsel, aware that a key witness, Gasperino, would not testify, was eager that the trial proceed, thinking that chances for an acquittal had improved, as undoubtedly they had. Whatever the reason, no mistrial was requested.
People v. Pollock (21 N Y 2d 206), cited by defense counsel, is inapposite. There the prejudice arose because the witness, in the presence of the jury, refused to testify on grounds of self incrimination. The witness had been named as an accomplice by each of the defendants in their confessions. When called as a witness, his refusal to testify tended to support an inference, as a practical matter, that he and the defendants on trial were involved together in the crime. The prosecutor had called the alleged accomplice to the witness stand, although he knew beforehand that the witness would refuse to testify. To the contrary, in this case the alleged prejudice arose solely from the failure to produce Gasperino; Gasperino did not invoke his privilege against self incrimination in the presence of the jury. True, De Tore’s lawyer in summation made reference to Gasperino’s claim of privilege but the court promptly instructed the jury to disregard any potential inferences from that fact. On this record, the error was harmless and, in any event, the instructions curative. A further, crucial distinction is that counsel in Polloch made proper motions for a mistrial.
Defendant De Tore makes much of the fact that over an extended period of time he was questioned, hounded, and wheedled by the police while he progressively yielded more information and eventually gave an alleged confession. All during this time he was not in formal custody, although it was becoming evident that he was a prime suspect. Defendant De Tore would have the court apply the rule of the McNabb and Mallory cases (McNabb v. United States, 318 U. S. 332; Mallory v. United *209 States, 354 U. S. 449) which held that an unnecessary delay between arrest and arraignment would require exclusion of confessions obtained during that period. The rule would not be applicable, even if it were still extant and even if it were to be applied in this State, since De Tore was never in custody during the period involved. Nor, for that matter are the rules of Miranda v. Arizona (384 U. S. 436) requiring the fourfold admonitions of the rights to counsel and to remain silent, applicable, for those rules have been thus far confined to custodial situations whether the custody be formal or not. It suffices that up to this time the courts have not required warnings or special instructions as to voluntariness, of confessions so long as the interrogations of suspects are not conducted while the suspects are in custody (cf., however, The Judges’ Rules, Rule II, Crim. L. Rev. [Eng.] [1964], at pp. 165, 167-168). Most important, and perhaps quite wisely, De Tore was given the appropriate admonitions early in his separate interrogations, as the suppression hearing court found. This was done shortly after the ring of guilt was beginning to close, but well before he was arrested.
It is noteworthy that the trial court in this case instructed the jury according to the teachings of People v. Carbonaro (21 N Y 2d 271, 277) and People v. Everett (10 N Y 2d 500, 506, cert. den. 370 U. S. 963), that prolonged detention without arraignment would be one circumstance, among others, to be considered in assessing the voluntariness of the confession. It also marshaled the evidence favorable to defendant De Tore’s questionable contention that police conduct between November 25, 1968 and December 5, 1968 amounted to custody, although De Tore had not yet been formally arrested. The court also instructed that if psychological coercion had been employed, as De Tore also contended, to extract the confession, it too was to be assessed by the jury. While truly the police were in unusually close contact with De Tore in the days immediately following his wife’s murder, such contact with close relatives would be a normal part of the investigative process, especially when the apparent motive was dubious and the true motive for the killing was an open issue. This contact became more sustained on December 3 and December 4 as De Tore revealed *210 his role in his wife’s death, and expressed his desire to help catch the men who had killed her. He was not under arrest, and was free to go at will.
Numerous trial errors are asserted, none requiring reversal. The two photographs of the deceased’s body, naked from the waist down, were admissible at the discretion of the Trial Judge to establish the People’s theory that the killer sought to mislead the police as to the motive for the crime by suggesting a sexual assault. No proper objection was made to the charge on the alibi defense. None of the other alleged errors in the charge are prejudicial. The prosecutor should not have revealed, in his closing, that all spectators were searched during La Spina’s testimony, but the error was cured by a cautionary instruction to the jury. If, as is contended, the prosecutor misrepresented to the jury that no consideration was offered to La Spina for his testimony, it is not established by the record. The appropriate remedy, if any, would lie by way of a motion to vacate judgment (see CPL 440.10).
Accordingly, the order of the Appellate Division affirming both judgments of conviction should be affirmed.
Judges Jasen, Gabrielli, Jones, Wachtler, Rabin and Stevens concur.
Order affirmed.

 Defendants also cite People v. Williams (292 N. Y. 297); but the case is irrelevant. That was a capital case in which this court had the power and duty to review the facts (N. Y. Const., art. VI, § 3; CPL 470.30, 470.35).