■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND ABNEY, Appellant.—Judgment, Supreme Court, New York County (Shirley Levittan, J.), rendered February 3, 1988, convicting defendant, after a jury trial, of two counts of murder in the second degree and one count each of burglary in the first degree and robbery in the first degree and sentencing him to concurrent indeterminate terms of imprisonment of from 15 years to life on the murder counts and from 5 to 15 years each on the burglary and robbery counts, reversed, on the law, and the indictment dismissed.

Defendant was jointly tried with Terry Angel for the murder of Walter Grant, who was beaten across the head with a hammer during the course of a burglary of Grant's apartment. Defendant was also charged with burglary and robbery in the connection with the incident. (A separate indictment against Angel and Ronald Reed, another alleged participant in the incident, charging them with burglary and related offenses, was dismissed against Angel on his speedy trial motion. Reed pleaded guilty to attempted burglary in the first degree in

exchange for his promise—subsequently breached—to testify against defendant and Angel.)

In a decision released simultaneously herewith, this court has reversed Angel's murder conviction and dismissed the indictment against him. The court found that the only direct evidence against Angel was the testimony of Rosa Robinson Cody, the victim's girlfriend, that on the morning of the incident Angel was with defendant and Reed across the street from the victim's apartment, the latter two carrying a television belonging to the victim, and Cody's testimony that after following the three men to a game room alleged to be a "crack house", she saw defendant say something to Reed, who then started towards Cody. This evidence was held insufficient to sustain Angel's conviction. (People v Angel, 158 AD2d 145.)

Since the only distinction between the two cases—that defendant Raymond Abney was one of the persons carrying the television set—is without legal significance, we think that the evidence here is similarly insufficient. Our dissenting colleague relies on the presumption that flows from recent exclusive possession of stolen goods. While defendant's possession of the television set may have been recent, it was not exclusive. Moreover, while recent exclusive possession of the fruits of a crime shortly after it occurred justifies, but does not require, the inference that the possessor was the thief (People v Shurn, 69 AD2d 64, 69; People v Donaldson, 107 AD2d 758, 759; see also, People v Baskerville, 60 NY2d 374, 382), we do not think that defendant's conviction can be sustained on the basis of this circumstantial evidence alone. Since this is a purely circumstantial case, the People were obliged to exclude every reasonable hypothesis of innocence; the inference of guilt must be the only one that can be drawn from the evidence. (People v Sanchez, 61 NY2d 1022, 1024.) At most, the evidence here would support a finding that defendant, acting in concert with Reed and Angel, criminally possessed the television. Since Reed admitted the burglary, it was possible that he burglarized the apartment alone or with someone other than defendant and that Reed or the other person or both assaulted Grant. Later, Reed could have sought out defendant or defendant and Angel, both of whom were known in the neighborhood, to help dispose of the property for a portion of the proceeds.

The cases cited by our dissenting colleague do not dictate a contrary result. In both People v Donaldson (107 AD2d 758, supra) and People v Velez (136 AD2d 753, lv denied 71 NY2d 904) there was other, highly incriminating evidence pointing

to the defendant's guilt. In *People v Ayers* (135 AD2d 825) and *People v Green* (128 AD2d 890), the defendant's recent exclusive possession warranted only one inference, i.e., guilt. That is not the case here.

In view of our determination dismissing the indictment, we find it unnecessary to address defendant's remaining contentions. Concur—Murphy, P. J., Sullivan, Rosenberger and Asch, JJ.

Milonas, J., dissents in part in a memorandum as follows: In my opinion, the judgment being appealed herein should be reversed and the matter remanded for a new trial.

Defendant Raymond Abney and his codefendant, Terry Angel, were convicted, following a jury trial, of two counts of murder in the second degree, one count of robbery in the first degree and one count of burglary in the first degree as the result of an incident which occurred on June 13, 1985 when Walter Grant, 62 years of age, was bashed on the head with a hammer during the course of a burglary of his apartment. The victim, who sustained skull fractures and other severe head trauma, died in the hospital on November 2, 1985 after a series of medical procedures failed to save his life. Two men, Angel and Ronald Reed, were arrested on the evening of the crime in the vicinity of the victim's home, and further investigation subsequently led the police to defendant. Defendant and Angel were thereafter tried jointly and convicted largely on the basis of the testimony of the deceased's girlfriend, Rosa Cody, that during the early morning of June 13th, 1985, she observed Reed and defendant, whom she knew as "Pee Wee", walking east on the block across the street from Grant's building and carrying a television set covered by a bed sheet. Angel was beside the two men and had a paper bag in his hand. There was no one else around when she saw the men, all of whom she was acquainted with from the neighborhood. She followed the three individuals as they walked north, eventually entering a "game room" where they deposited the television set on the floor. The television resembled one that the victim had purchased for the apartment which he and Cody shared. Reed, in effect, chased Cody out of the establishment, and she then ran to a friend's home which was situated near that of the victim and announced that she believed that Angel had her television. She proceeded to Grant's building, and, after speaking briefly with the superintendent, went to the former's apartment. The door was slightly ajar, and the lights inside were off. Cody turned the lights on and discovered that the premises had been ransacked, and things were

scattered all about. The new television, along with some other items, was missing. In the bedroom, the victim was lying on the edge of the bed in a puddle of blood, his feet hanging off.

In addition, Eugene Wilkerson, who was the cousin of the deceased's former wife and had been residing in the subject apartment for the past several months, testified that he had accompanied Grant when the latter purchased a new television set for the apartment. Although Wilkerson had been in the apartment during the commission of the crime (the perpetrators had locked him in his room by placing a coat hanger wire through a hole in the doorknob), he was apparently unaware of what had happened until Cody removed the wire, thereby releasing him. According to Wilkerson, the television set had been in the living room the previous night. Both he and Officer Daniel Waldvogel, one of the policemen who responded to a radio call concerning the events in question, confirmed that the apartment was in disarray and that the victim was lying half on the bloodied bed and half off, barely conscious and bleeding from head injuries. It should also be noted that the Medical Examiner stated that the condition of the deceased's skull was consistent with a depressed skull fracture caused by a blow with a blunt instrument. Further, while the death did not occur until months later, there was clear evidence that it was directly attributable to the initial head injuries suffered in the course of the commission of the crime.

On appeal, defendant urges, in part, and the majority considers persuasive, that the proof was insufficient to support the verdict since he was never observed entering or leaving the apartment; that there was no physical evidence establishing that he had been in the premises or that the victim's death resulted from action taken in the course of, or in furtherance of, or in immediate flight, from the crime. However, the jury found defendant guilty, and therefore, it is axiomatic that the evidence at trial must be viewed in the light most favorable to the People *(People v Malizia,* 62 NY2d 755, *cert denied* 469 US 932; *People v Contes,* 60 NY2d 620; *People v Kennedy,* 47 NY2d 196). As the Court of Appeals declared in *People v Contes (supra,* at 621), "[t]he standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (emphasis in original). In that regard, it cannot be held as a matter of law that a rational trier of the facts was

376

unwarranted in finding defendant guilty beyond a reasonable doubt. Certainly, defendant's recent and exclusive possession of the fruits of the crime, since it was unexplained, was sufficient to create an inference of guilt and, thus, sustain the conviction *(People v Donaldson,* 107 AD2d 758, 759; *see also, People v Velez,* 136 AD2d 753; *People v Ayers,* 135 AD2d 825; *People v Green,* 128 AD2d 890).[1]

Contrary to the majority's view that possession of the television set was the only evidence against defendant, there is strong additional circumstantial proof connecting him to the crime. He and Reed were observed in the early morning hours of the day of the robbery, carrying a large television closely resembling that of the victim's missing set, and they were across the street from Grant's apartment when they were spotted. It somehow strains credulity to conclude that carrying a 27-inch television set on the street at some time between 4:00 and 5:00 A.M. right across from where an elderly man has just been bludgeoned, burglarized and robbed of, among other things, a similar television set is susceptible of innocent interpretation, particularly where there is also testimony from Wilkerson that he was awakened by noise on the stairway and that he heard footsteps going down the stairs shortly before defendant was seen in the street. It is scarcely conceivable that defendant just happened, coincidentally, to bump into Reed on a deserted street at 4:00 to 5:00 in the morning while Reed was struggling by himself to move a large television and that defendant generously offered to assist in carrying the set. In any event, regardless of whether or not the evidence at trial was adequate to support Angel's conviction, the latter at least, unlike defendant, was not actually seen with the television in his hands so that defendant's situation is distinguishable from that of Angel.

However, while I believe that the evidence was more than ample to justify the conviction herein, the judgment should, nonetheless, be reserved and the matter remanded for a new trial on the ground that defendant was denied his right to a fair trial. The defect involved is that the prosecutor made use of statements provided by Reed despite his never appearing at trial as a witness. In order to procure Reed's testimony

1. The majority appear to hold that since defendant was not carrying the television set alone, but was assisted by another person, his possession was not exclusive, and, hence, the adverse inference does not apply. However, it would have been extremely difficult, if not impossible, for one person to carry the 27-inch television set due to its bulk and weight. The defendant's possession was as exclusive as it could have physically been.

against defendant and Angel, the People entered into a plea bargain with him pursuant to which he was permitted to plead guilty to attempted burglary in the first degree in exchange for his cooperation.[2] Reed ultimately breached his promise and refused to take the stand against defendant and Angel. Reed's unwillingness to testify was communicated to the court and to the District Attorney right at the beginning of the trial, and prior to the prosecutor's opening statement, when his counsel announced that "I spoke to the defendant [Reed] and he has authorized me to tell each of the co-counsel and the District Attorney's office that he doesn't want to testify in this case, and he doesn't want to speak to anybody about the case". Although it appears that the prosecutor did not entirely accept that Reed could not ultimately be persuaded to testify, it is clear that she was alerted to the distinct possibility, indeed, even the likelihood, that he would not comply with the terms of the plea arrangement. Nevertheless, the Trial Assistant, in her opening statement, proceeded to inform the jury not only that she intended to call Reed as a witness but also described the contents of his anticipated testimony. Accordingly, she stated that Rosa Cody, along with Reed, Angel and defendant, were gathered on a street corner across from the deceased's apartment on the night of the crime, and they were laughing and drinking during most of the early morning hours. Cody eventually left the group at which point:

"Mr. Reed, Pee Wee, Mr. Angel continued to hang out in the street corner. They were drinking and they had run out of money so Mr. Ronny Reed decided he was going to get some more money so he could buy some more alcohol. He went across the street so he could peruse a car. He couldn't find one, as he was standing outside of 479 West 146th Street he looked up and saw there was a window open to one of the apartments in the building. Mr. Reed knew Miss Robinson [Rosa Cody]. Mr. Reed knew Miss Robinson lived with an elderly gentlemen in that building, but he wasn't certain which apartment was hers, so he crawled up on the fire escape and he catwalked along the window ledge until he got into the window. He went into the apartment and he didn't hear anybody inside and it was dark. He walked to the front of the

---

2. The People originally also entered into a plea bargain with the defendant herein in exchange for his testimony against Angel, the alleged hammer-wielder. However, the agreement eventually fell apart when he subsequently failed to adhere to the version of the crime outlined during the plea allocution, and the court permitted him to withdraw his plea.

apartment building and he locked the front door and he went downstairs. When he got to the street he called up over to Mr. Angel and Mr. Abney to come join him in the apartment. Mr. Abney, Mr. Angel returned up to the apartment and they were let in by Mr. Ronny Reed. When they got back into the apartment they began to ransack the apartment. They took food out of the freezer and what was there, they scattered belongings of Mr. Grant and Miss Robinson throughout the living room and in the words of Mr. Reed they went there to get whatever they could, whatever they could sell quickly on the street.

"After ransacking the apartment Mr. Reed and Mr. Abney moved a TV set belonging to Mr. Grant out into the front hallway of the apartment. There they waited, calling out to Mr. Angel to come join them. At about that point Mr. Reed heard a noise, noises coming from the back bedroom which sounded like a struggle going on. He went back into the darkened apartment until he got near the back bedroom. When he entered the bedroom it was dark there and he couldn't see anything, so he fumbled around for the light switch, finally turning on a lamp. When the lights went on, Mr. Reed saw the crumpled body of 65 year old Walter Grant slumped to the ground, his head bleeding profusely. Mr. Grant gasping, barely conscious; standing next to the bed Mr. Reed saw the defendant, Terry Angel with a bloody hammer in his hand. Mr. Reed panicked. He said let's get out of here, let's get out of here, and two of them went towards the front of the apartment where they joined then Raymond Abney who was standing outside with a TV set that they had intended to steal."

The prosecutor thereafter advised the jury that "through the testimony of Ronny Reed you will learn that it was their intention when they entered the building to burglarize it, to steal anything they could find inside." Reed, however, persisted in his refusal to testify and was declared to be in contempt by the court. Yet, despite his failure to appear as a witness, the jury were exposed to his testimony by means of the District Attorney's detailed exposition of the information which he had evidently previously supplied to the prosecution. At the time that she delivered her comments, she was, at best, uncertain as to whether Reed would testify, and, at worst, she chose utterly to disregard Reed's clear signal that he was balking at taking the stand. Consequently, the jury heard facts which the People were otherwise unable to prove since, in the absence of Reed, the case against defendant was wholly

circumstantial. Then, as if to highlight Reed's inadmissible evidence, the People moved to admit a redacted version of his plea allocution, offering it as a declaration against penal interest notwithstanding that Reed himself never testified. The court, over defendant's objection, permitted the introduction of the plea allocution after the parties agreed on what should be redacted. The following colloquy was then read to the jury:

"THE COURT: You plead guilty to Attempted Burglary in the First Degree. Did you enter into an apartment without permission or consent of the owner or occupant of that apartment?

"DEFENDANT REED: Yes, I did your Honor.

"THE COURT: And how did you get into that apartment?

"DEFENDANT REED: Through a window. Through a window.

"THE COURT: Through a window? And where was this building located?

"DEFENDANT REED: 126th and Amsterdam.

"THE COURT: And after you got into that apartment without permission or consent of the owner or occupant of this apartment, did you intend to commit a crime inside this apartment?

"DEFENDANT REED: Yeah.

"THE COURT: What crime? What did you intend to do?

"DEFENDANT REED: Rob.

"THE COURT: You mean take property?

"DEFENDANT REED: Yes, sir.

"THE COURT: While you were inside this apartment was the occupant or the owner or the resident of this apartment present in the bedroom?

"DEFENDANT REED: Yes.

"THE COURT: Was he assaulted?

"DEFENDANT REED: Yes, sir.

"THE COURT: And how was he assaulted?

"DEFENDANT REED: Beat up, he was.

"THE COURT: Hit on the head with an instrument?

"DEFENDANT REED: Yes, sir.

"THE COURT: What was the instrument?

"DEFENDANT REED: A hammer.

"THE COURT: Hammer?

"DEFENDANT REED: Yes."

The court proceeded to instruct the jury that "you are to scrutinize the statement of said Ronnie Reed with care in judging his reliability. It is received only and solely for the purpose of establishing that there was a burglary of the Grant apartment on June 13th of 1985 and that at the time there was an assault on Mr. Grant with a hammer. You are to limit your consideration of this statement strictly to those two issues and to those two issues only". The devastating impact of the Trial Assistant's account of Reed's version of events, bolstered by Reed's redacted plea allocution, was hardly attenuated by the court's subsequent admonition to the jury that:

"the assistant district attorney made certain remarks with regard to the testimony that she expected to elicit. Remember, as I told you at the time, an opening statement is not evidence and must not be so regarded by you. You are not to consider any of that opening as evidence in this case, nor are you to speculate anything that may have been said in that opening.
* * *

"In this connection there was received in evidence part of the plea allocution of one Ronnie Reed who, by his own words, took part in the burglary of the Grant apartment on June 13th of 1985.

"Mr. Reed, however, did not testify here and you are not to speculate as to what he might have said had he testified. He did not testify for reasons that are legal and which do not in any way concern you and I ask you and I order you, such as I may order you, that you are not to speculate on what his testimony would have been had he testified. Ladies and gentlemen, that is not a proper subject for discussion during your deliberations in the juryroom."

Although the People argue that Reed's plea allocution was appropriately allowed into evidence as an admission against penal interest pursuant to *People v Thomas* (68 NY2d 194, *cert denied* 480 US 948; *see also, People v Settles,* 46 NY2d 154; *People v Maerling,* 46 NY2d 289), the fact is that there was substantial independent proof that Grant's apartment had been burglarized and that he had been assaulted. The significant effect of admitting the allocution was to prejudicially connect Reed and, thereby, defendant and Angel to the commission of the crime. Consequently, the prosecutor's improper opening statement was wrongfully supported by Reed's plea allocution, even in its redacted form, particularly because the only other evidence linking the three men to the crime was circumstantial. In the instant situation, it was simply an

abuse of discretion for the trial court to have permitted the People to use Reed's allocution.

In *People v De Tore* (34 NY2d 199, 207), the Court of Appeals asserted in connection with the failure therein by the People to produce a witness that "it happens not infrequently that a prosecutor is unable to prove every statement made in his opening especially when he must rely on criminal characters. But the general rule is that, absent bad faith or undue prejudice, a trial will not be undone". Under the circumstances herein, where the District Attorney was fully apprised of Reed's unwillingness to testify when she related to the jury the precise details of his account of the crime, bad faith on the part of the People can hardly be ruled out. It is also ironic that on appeal, the prosecution argues that, on the one hand, the court's curative instructions to the jury adequately avoided undue prejudice to defendant but, on the other hand, points to Reed's statements during the plea allocution as direct evidence of defendant's guilt. If the People cannot properly distinguish in their brief between evidence which may be considered by the jury and that which may not, then the jury surely cannot be expected to separate out from the competent evidence the Trial Assistant's highly prejudicial comments concerning Reed's inadmissible statements, especially when these comments were later improperly bolstered by a reading of his plea allocution. Since neither the lack of bad faith nor the absence of undue prejudice is apparent here, a reversal is mandated.

Finally, it is significant that defendant, contrary to the People's contention that he has failed to preserve his claim that he was incurably prejudiced by the District Attorney's opening statements, did not waive any rights in this respect. He moved for a mistrial at the close of the evidence and cannot have been expected to object to the prosecutor's comments on the basis of the People's prospective (that is, as yet unrealized) inability to produce that which was promised in the opening statements. Clearly, it was not so much the statements themselves that were improper but those statements in the context of what occurred afterwards. Certainly, the defendant cannot be held accountable for not objecting to future events. Defendant's constitutional right to confront the witnesses against him *(Douglas v Alabama,* 380 US 415) having been violated and, therefore, his right to a fair trial, the judgment of conviction should be reversed, and the matter remanded for a new trial.

■ FRANCINE AARON, Individually and as Administratrix of